## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-2634

SETH GARRETT FRANCO,

     Plaintiff,

vs.

CITY OF BOULDER, COLORADO;
OFFICER DILLON GARRETSON, in his individual capacity;
OFFICER STEPHEN COON, in his individual capacity;
DETECTIVE ASHLY FLYNN, in her individual capacity;
SERGEANT KRISTI PETERSON, in her individual capacity;

     Defendants.

---

## COMPLAINT

---

Plaintiff Seth Garrett Franco, by and through his attorney, R. Christian Griffin of Christian Griffin Law, LLC, for his Complaint against the Defendants, respectfully alleges and avers as follows:

### INTRODUCTION

1.     Boulder Police Officers Michael Marquez and Dillon Garretson knew that Mr. Franco was entering into a plea agreement on September 22, 2017, in order to resolve a criminal case in which he had allegedly squeezed one of Officer Marquez's testicles approximately one year prior.

2.     Officer Marquez was present at Mr. Franco's court appearance on September 22, 2017, and he addressed the presiding judge before Mr. Franco was sentenced to probation.

3.     After court, Mr. Franco became despondent and suicidal.

4.      As a result, Mr. Franco's probation officer, Barbara Polk, called 911 to request a welfare check for the purpose of ensuring that Mr. Franco was safe.

5.      Rather than conducting a welfare check, however, responding officers decided to arrest Mr. Franco, despite the fact that there was no information or evidence to suggest he had committed any crime.

6.      To the contrary, as noted by the Honorable Judge Noel Blum, who presided over the suppression hearing regarding the arrest and search that took place on September 22, 2017, "no reasonable officer" would have believed that Mr. Franco's actions constituted criminal conduct prior to the responding officers' decision to arrest him during the course of what was supposed to be a welfare check. (*See* Ex. 1, Order Regarding Pending Motions at p. 9).

7.      Notwithstanding the lack of any criminal activity, the responding officers did arrest Mr. Franco, and then chose to rummage through his personal belongings instead of helping him, which was the reason Ms. Polk had called 911 in the first place.

8.      These officers' actions were informed and guided in part by the words and conduct of Officers Marquez and Garretson, who were friends, former patrol partners, and co-participants in the forcible arrest incident during which Mr. Franco had allegedly squeezed Officer Marquez's testicle one year prior.

9.      Moreover, the unconstitutional search and seizure took place with the approval of at least one supervising officer, Sergeant Kristi Peterson, who was present at the scene and condoned the other officers' illegal actions.

10.      The responding officers' decision to arrest Mr. Franco and to search his personal belongings on September 22, 2017, was engendered in part by animus toward Mr. Franco.

11.     Their actions were carried out not only in violation of Mr. Franco's constitutional right to be free from unreasonable searches and seizures, but also in violation of the Boulder Police Department's policy and procedures governing arrestable offenses, which, due to a custom, pattern, and practice of not being properly trained and supervised, the responding officers ignored on September 22, 2017.

12.     As a result, Mr. Franco was injured.

13.     Through this action, Mr. Franco seeks redress for the damages caused by the responding officers' unconstitutional conduct on September 22, 2017.

## JURISDICTION

14.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution to redress the deprivation of his rights, privileges, or immunities secured by the United States Constitution and laws, and so deprived under color of law.

15.     This Court has subject matter jurisdiction pursuant to Article III, Section 2 of the United States Constitution and 28 U.S.C. § 1331.

16.     This action arises under the Constitution and laws of the United States.

## VENUE

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b), because all parties reside within the District of Colorado and the events described in this Complaint occurred in the District of Colorado.

## PARTIES

18.     At all times relevant to this Complaint, Plaintiff was a resident of the State of Colorado.

19.     Defendant City of Boulder ("Boulder") is a Colorado municipal corporation. At all times relevant to this Complaint, Boulder maintained the Boulder Police Department ("BPD") and was responsible for BPD's customs, policies, patterns, and practices, as well as for the hiring, training, conduct, supervision, and discipline of all BPD personnel, including the individuals named as defendants in this action.

20.     At all times relevant to this Complaint, Defendants Dillon Garretson, Stephen Coon, Ashly Flynn, and Kristi Peterson (collectively, "Individual Defendants") were residents of the State of Colorado.

21.     At all times relevant to this Complaint, the Individual Defendants were acting within the scope of their official duties and employment and under color of state law as police officers for BPD.

## FACTUAL ALLEGATIONS

22.     On September 22, 2017, Mr. Franco entered into a plea agreement in Boulder District Court Case 16CR1703.

23.     Pursuant to that plea agreement, Mr. Franco pled guilty to one count of second degree assault and was sentenced to probation.

24.     That case arose from an altercation in August 2016, during which BPD Officer Michael Marquez had forcibly arrested Mr. Franco for an open container violation on "The Hill" in Boulder.

25.     According to Officer Marquez, Mr. Franco had squeezed one of his testicles while Officer Marquez was on top of Mr. Franco forcibly arresting him for the open container violation.

26.     After the alleged testicle squeeze, Officer Marquez punched Mr. Franco in the head so hard that he broke his own hand.

27.     Officer Marquez was present in court for Mr. Franco's plea and sentencing on September 22, 2017, and he addressed the presiding judge before Mr. Franco was sentenced to probation that morning.

28.     Later that day, after leaving court, Mr. Franco became despondent and suicidal.

29.     Mr. Franco expressed his suicidal ideations to his then-girlfriend, Rowen Bautts.

30.     He told her that "his soul was too tired to go on," and that "it was time for him to meet his father in heaven."

31.     Mr. Franco has a history of traumatic brain injuries that pre-date Officer Marquez's punching him in the head so hard that he broke his hand.

32.     His statement regarding "his father in heaven" referred to his biological father, whom Mr. Franco had found dead when he was seventeen years old—one year after his first traumatic brain injury—prompting him to leave Florida and move to Boulder, Colorado, where he lived at Attention Homes and graduated from high school on his own.

33.     When Mr. Franco expressed suicidal ideations on September 22, 2017, Ms. Bautts relayed her concerns about Mr. Franco to his probation officer, Barbara Polk.

34.     Ms. Polk cared deeply about Mr. Franco, having worked with him for several months while he was on bond.

35.     Concerned for Mr. Franco's personal safety, Ms. Polk called 911.

36.     She called 911 to report that Mr. Franco was threatening to kill himself and to request a welfare check.

37.     When she called 911, Ms. Polk did not suspect that Mr. Franco had committed any crimes, and she did not request or authorize an arrest of Mr. Franco.

38.     She only wanted officers to check on Mr. Franco and make sure he was safe.

39.     Because of Ms. Polk's 911 call, dispatch aired a welfare check.

40.     Officers from BPD responded to the dispatch.

41.     These responding officers included the Individual Defendants.

42.     After speaking to Ms. Bautts, the responding officers learned that Mr. Franco had gone to the Dushanbe Tea House in Boulder, where he worked.

43.     Upon learning this, the responding officers went to the tea house and found Mr. Franco standing inside talking to another employee.

44.     The Individual Defendants then entered the tea house.

45.     Officer Garretson, who was armed and in uniform, immediately ordered Mr. Franco to "stop" and "come here."

46.     When Mr. Franco tried to walk away, Officer Garretson grabbed him and put him into handcuffs.

47.     In handcuffs, Mr. Franco was then surrounded by other police officers.

48.     At least five police officers surrounded Mr. Franco while he was handcuffed inside the tea house, as established by body camera footage and the prior sworn testimony of Officer Stephen Coon.

49.     The officers who surrounded Mr. Franco inside the tea house included all the Individual Defendants.

50.     Officer Marquez, at that time, was communicating with the responding officers from another location.

51.     Upon information and belief, Officer Marquez had encouraged the other responding officers to arrest Mr. Franco for possessing a beer, when, in fact, there was no lawful authority to effect such an arrest.

6

52.     As soon as Officer Garretson made eye contact with Mr. Franco inside the tea house and ordered him to "stop," Mr. Franco was not free to walk away and leave the responding officers.

53.     Instead, while Mr. Franco was in handcuffs and surrounded by at least five armed police officers inside the tea house, the responding officers patted him down and cut his backpack off his back with a large knife.

54.     All the Individual Defendants were present inside the tea house and assisted with the prolonged, illegal detention of Mr. Franco and the accompanying pat-down search.

55.     Officer Coon was the one who cut Mr. Franco's backpack off with a knife.

56.     During the pat-down search, the responding officers did not find any weapons, illegal drugs, controlled substances, or any other evidence of any criminal activity.

57.     After the pat-down search, the responding officers walked Mr. Franco, in handcuffs, outside the tea house, where they forced him to sit on a concrete barrier.

58.     Once outside, Officer Garretson immediately searched Mr. Franco's backpack without a search warrant.

59.     This search took place while Mr. Franco was sitting on the concrete barrier, before he had been examined by any EMTs or other medical professionals.

60.     During the search, Officer Garretson found one small psilocybin mushroom in a plastic baggy located in a pocket inside of the backpack.

61.     As a result, Mr. Franco was subsequently charged in state court with one count of unlawful possession of a schedule I controlled substance, a class four drug felony.

62.     That charge was the sole charge at issue in Boulder District Court Case 17CR1941.

63.     A suppression hearing was held in Case 17CR1941 on October 2, 2018.

64.     The Honorable Judge Noel Blum presided over that motions hearing.

65.     After the hearing, Judge Blum issued a written order, ruling, *inter alia*, that the arrest of Mr. Franco and warrantless search of his backpack on September 22, 2017, violated Mr. Franco's right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution. (*See* Ex. 1 at pp. 2-15).

66.     Case 17CR1941 was subsequently dismissed by the prosecution.

67.     On September 22, 2017, the Individual Defendants never attempted to get any help for Mr. Franco; nor did they try to determine whether he was a danger to himself or others, despite the fact that they contacted him due to a welfare check.

68.     Instead, they chose at the very outset to treat Mr. Franco as a criminal and to arrest him for crimes that were factually and legally impossible.

69.     Their actions that night were goaded by Officer Marquez, who had been attempting to intimidate Mr. Franco ever since he had allegedly squeezed one of his testicles in August 2016.

70.     Officer Marquez's harassment of Mr. Franco had even become a topic of conversation among Mr. Franco's public defender, his probation officer, and at least one of the prosecuting attorneys involved in Case 16CR1703, the case in which Officer Marquez had punched Mr. Franco in the head.

71.     In the months leading up to Mr. Franco's guilty plea on September 22, 2017, Officer Marquez had followed Mr. Franco around Boulder and glared at him in court.

72.     Mr. Franco had come to fear Officer Marquez; he even worried that Officer Marquez might try to harm him.

73.     During this time, Officer Marquez was employed by BPD, which was aware of and responsible for his actions as a police officer.

74.    On September 22, 2017, Officer Marquez knew of the welfare check requested by Ms. Polk.

75.    After learning of Ms. Polk's request for a welfare check, Officer Marquez personally communicated with Officer Coon, who was looking for Mr. Franco.

76.    Officer Marquez told Officer Coon that possessing or consuming alcohol constituted a violation of Mr. Franco's probation.

77.    After Officer Marquez spoke to Officer Coon about Mr. Franco's probation, the responding officers decided to arrest Mr. Franco once they found him.

78.    This decision was based on Ms. Bautts' report that Mr. Franco had consumed part of one beer before leaving her house, coupled with Officer Marquez's representation that drinking that beer was a violation of the terms and conditions of Mr. Franco's probation.

79.    Violating the terms and conditions of one's probation is not, in and of itself, a crime.

80.    Violating the terms and conditions of one's probation is not, in and of itself, a legal basis for an arrest.

81.    The Individual Defendants never intended to actually conduct a welfare check of Mr. Franco on September 22, 2017.

82.    The Individual Defendants wanted to arrest Mr. Franco before they made contact with him on September 22, 2017.

83.    Officer Garretson, specifically, had animus toward Mr. Franco because of his prior case involving Officer Marquez, which is why he chose to arrest Mr. Franco rather than conduct a welfare check on September 22, 2017.

84.    The Individual Defendants knew there was no lawful basis for searching Mr. Franco's backpack without a warrant after they removed him from the tea house.

85.     Prior to the warrantless search, the Individual Defendants knew that dispatch had aired out a welfare check for Mr. Franco's safety, not a report that he had committed any crimes.

86.     The Individual Defendants also knew that upon contacting Mr. Franco inside the tea house, there was no evidence that he had been involved in any criminal activity prior to the contact.

87.     In fact, prior to the warrantless search of Mr. Franco's backpack, the Individual Defendants did not even have reasonable suspicion—let alone probable cause—to believe that Mr. Franco had committed any crimes, as stated in Judge Blum's order suppressing the unconstitutional search that took place on September 22, 2017. (*See* Ex. 1 at p. 13).

88.     Because the Individual Defendants did not have a lawful basis to arrest Mr. Franco, there was no lawful justification for any search incident to arrest.

89.     As part of a welfare check, the responding officers were lawfully permitted to conduct only a pat-down search for officer safety, which they performed inside the tea house, finding no weapons or evidence of any criminal activity.

90.     Officer Garretson knew there was no lawful justification for searching Mr. Franco's backpack without a warrant.

91.     Notwithstanding this, after Officer Coon cut the backpack off of Mr. Franco with a knife, Officer Garretson opened the backpack and rummaged through it without obtaining or attempting to obtain a search warrant.

92.     Detective Flynn was present outside the tea house when Officer Garretson searched Mr. Franco's backpack, and she condoned Officer Garretson's actions by not intervening, instead allowing the search to take place in her presence.

93.     Sergeant Peterson was present outside the tea house when Officer Garretson searched Mr. Franco's backpack, and she condoned Officer Garretson's actions by not intervening, instead allowing the search to take place in her presence.

94.     BPD has a policy and procedures for when officers are allowed to make an arrest.

95.     Pursuant to BPD's General Order 200, "officers are allowed to arrest based on probable cause to believe an individual violated a municipal ordinance, state statute or federal law or on the basis of an arrest warrant."

96.     BPD's policies and procedures did not authorize the arrest of Mr. Franco on September 22, 2017.

97.     However, BPD has a custom, pattern, and practice of not properly implementing General Order 200 and not training and supervising its officers in a manner to ensure that the policy and procedures are followed.

98.     This is evidenced by Officer Garretson's and Officer Coon's testimony during the suppression hearing held regarding the constitutionality of the illegal arrest and search at issue in this action.

99.     During that hearing, both Officer Garretson and Officer Coon testified that, since Mr. Franco was on probation, consuming alcohol constituted an arrestable offense.

100.    BPD's custom, pattern, and practice of failing to properly train and supervise its officers with respect to its arrest policy and procedures is further evidenced by the fact that both a detective and a sergeant were present at the scene of Mr. Franco's arrest, participated in arresting Mr. Franco, and condoned the other officers' actions on the basis of nothing more than an alleged probation violation.

101.    Because of BPD's custom, pattern, and practice of not properly training and supervising its officers with respect to its own policy and procedures governing arrestable offenses, Officers Marquez and Garretson were able to use an ostensible probation violation as a ruse in order to arrest someone they disliked, and the other responding officers participated in effecting that arrest.

102.    BPD does not have any written policies or procedures related to the permissible scope of a search carried out during the course of a welfare check, despite well-settled case law on this issue.

103.    Due to BPD's lack of any policies or procedures regarding searches conducted during welfare checks, the Individual Defendants apparently felt free to rummage through Mr. Franco's personal belongings after handcuffing him and removing him from the tea house.

104.    Because of the Individual Defendants' unlawful arrest of Mr. Franco and illegal search of his backpack on September 22, 2017, Mr. Franco suffered damages.

105.    Specifically, Mr. Franco suffered extreme humiliation at the tea house when he was arrested in front of his friends and co-workers and then experienced further emotional distress and mental anguish and suffering while incarcerated at the Boulder County Jail for three days, during which time he was strapped to a "suicide chair" for several hours and deprived of his regular regimen of anti-seizure medication.

106.    He also suffered lost wages and emotional pain and suffering in an amount to be determined at trial.

## FIRST CLAIM FOR RELIEF
(42 U.S.C. § 1983; Fourth and Fourteenth Amendments; Unconstitutional, Warrantless Arrest)
*Against All Defendants*

107.    Plaintiff hereby incorporates by reference all the allegations set forth in the preceding paragraphs of this Complaint.

108.    The Fourth Amendment, applicable to the States through the Fourteenth Amendment, proscribes unreasonable seizures.

109.    Under the Fourth Amendment, for a warrantless arrest to be legal, arresting officers must have probable cause to believe that an arrestee has committed a crime.

110.    On September 22, 2017, the Individual Defendants arrested Mr. Franco without a warrant.

111.    The Individual Defendants did not have probable cause to believe that Mr. Franco had committed any crimes before arresting him on September 22, 2017.

112.    The Individual Defendants subjected Mr. Franco to an unreasonable seizure in violation of his clearly established rights under the Fourth Amendment.

113.    The Individual Defendants' warrantless arrest of Mr. Franco was condoned by at least one supervising officer, who was present when the arrest occurred and helped the other officers effect the arrest.

114.    The warrantless arrest was facilitated by BPD's custom, pattern, and practice of not properly implementing its arrest policy and procedures and failing to appropriately train and supervise its officers with respect to that policy and those procedures.

115.    Mr. Franco is entitled to declaratory relief, compensatory and punitive damages, an award of reasonable costs and attorney's fees, and such other relief as the Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
(42 U.S.C. § 1983; Fourth and Fourteenth Amendments; Unconstitutional, Warrantless Search)
*Against Defendants Garretson, Coon, and Boulder*

116.    Plaintiff hereby incorporates by reference all the allegations set forth in the preceding paragraphs of this Complaint.

117.    The Fourth Amendment, applicable to the States through the Fourteenth Amendment, proscribes unreasonable searches.

118.    Under the Fourth Amendment, for a search to be legal, the officers conducting the search must have a search warrant, or the search must fall within one of the specifically established and delineated exceptions to the warrant requirement.

119.    On September 22, 2017, Officer Coon cut Mr. Franco's backpack off of his back with a knife, and Officer Garretson searched the backpack.

120.    Officers Coon and Garretson did not have a warrant to search Mr. Franco's backpack, and the search did not fall within any of the specifically established and delineated exceptions to the warrant requirement.

121.    Officers Coon and Garretson subjected Mr. Franco to an unreasonable search in violation of his clearly established rights under the Fourth Amendment.

122.    Officers Coon and Garretson's warrantless search of Mr. Franco's backpack was condoned by at least one supervising officer, who was present when the search occurred.

123.    The warrantless search was facilitated by BPD's custom, pattern, and practice of not adopting any policies or procedures regarding the scope of permissible searches during the course of a welfare check and of failing to appropriately train and supervise its officers with respect to the scope of permissible searches during the course of a welfare check.

124.    Mr. Franco is entitled to declaratory relief, compensatory and punitive damages, an award of reasonable costs and attorney's fees, and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for relief as follows:

125.    An award of compensatory damages;

126.    An award of punitive damages;

127.    An award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and all applicable law;

128.    Interest from the date of each violation;

129.    A declaration that the conduct of the Defendants in arresting Mr. Franco on September 22, 2017, and searching his personal property was unconstitutional; and

130.    Any further or other relief the Court deems just and proper.

## **JURY DEMAND**

131.    Plaintiff demands a trial by jury in this matter.

DATED September 16, 2019.

s/ *R. Christian Griffin*
R. Christian Griffin, #42325
CHRISTIAN GRIFFIN LAW, LLC
P.O. Box 270310
Louisville, CO 80027
christian@christiangriffinlaw.com
(720) 524-4406
*Attorney for Plaintiff*