IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02634-MEH

SAGE B. FRANCO, Personal Representative of the Estate of Seth Garrett Franco,

     Plaintiff,

v.

CITY OF BOULDER, COLORADO;
OFFICER DILLON GARRETSON;
OFFICER STEPHEN COON;
DETECTIVE ASHLY FLYNN; and
SERGEANT KRISTI PETERSON,

     Defendants.

_____

## ORDER

_____

**Michael E. Hegarty, United States Magistrate Judge.**

     Before the Court is Defendants' Combined Motion for Summary Judgment. ECF 61. The matter is fully briefed, and the Court finds that oral arguments will not materially assist in its adjudication. For the following reasons and based on the submitted record, the Motion is granted in part and denied in part.

## BACKGROUND

I.    **Claims for Relief**

     This case arises from the arrest and search of Seth Garrett Franco on September 22, 2017. Although his estate's personal representative has replaced him as the party-plaintiff,[1] the Court will continue to refer to him as the Plaintiff in the below discussion for clarity because the events

_____

1 A Suggestion of Death was filed at ECF 37 indicating that Seth Garrett Franco passed away on March 2, 2020. No cause of death was given.

involved him. Plaintiff alleges that Defendants violated his Fourth Amendment rights during what was supposed to be only a "welfare check." He asserts two claims for relief—for unlawful arrest and search—pursuant to 42 U.S.C. § 1983.

## II.   Material Undisputed Facts

1.      At approximately 8:53 p.m. on September 22, 2017, Barbara Polk called 9-1-1 to request a welfare check. She was Plaintiff's probation officer and was concerned that he may be suicidal. ECF 61-1 (Exhibit A at 0:03-1:53); ECF 61-2; ECF 66-2 at 5.

2.      The 9-1-1 dispatcher asked about the suicide threats. She explained that previously, Plaintiff had threatened suicide by gun. She did not believe he currently had a gun, but he knew where to obtain one. ECF 61-1 (Exhibit A at 2:00-2:16).

3.      Probation Officer Polk learned about Plaintiff's suicidal condition from his girlfriend. ECF 66-2 at 5. She informed the 9-1-1 dispatcher that his girlfriend was with him and had described him as "totally unstable." Probation Officer Polk confirmed that Plaintiff was on "a whole boat load" of medications. ECF 61-1 (Exhibit A at 3:05-3:36). According to the girlfriend, Plaintiff had "just taken all of his pills," but Probation Officer Polk was unsure whether she meant in the sense of leaving the house with them or ingesting them. ECF 66-2 at 9; ECF 77-3 at 3.

4.      She added that Plaintiff suffered from a traumatic brain injury, epilepsy, and depression. ECF 61-1 (Exhibit A at 3:09-3:20).

5.      Probation Officer Polk said nothing about any criminal activity. ECF 66-2 at 7. She did not request or authorize his arrest or placement in jail. She did not send a "detainer" to the Boulder Police Department, which is how she requests a probationer's arrest. ECF 66-2 at 7–8.

6.      Probation Officer Polk gave the 9-1-1 dispatcher Plaintiff's address. ECF 61-2 (Exhibit A at 0:52-1:18, 3:04-3:09, 4:10-4:23).

7.      Because of that call, Boulder Police Officer Coon was dispatched to conduct a welfare check at the address. ECF 61-2 at 1; ECF 66-3 at 10. He was the primary responding officer, and as such, Officer Coon was responsible for putting the investigation together, heading it, and completing the report. ECF 66-3 at 7. He also had the discretion to determine whether there was probable cause to make an arrest. ECF 66-14 at 12–13.

8.      Officer Coon encountered Mr. Bautts at Plaintiff's address. Mr. Bautts informed Officer Coon that Plaintiff was dating his daughter and had lived with them for about one to two months. Mr. Bautts explained that Plaintiff returned from a court hearing that had gone "particularly well for him but he doesn't seem to believe that and he's kind-of lost it." Otherwise, Mr. Bautts knew little about what was happening. ECF 61-1 (Exhibit C at 2:50-3:12).

9.      Earlier that same day, Plaintiff had pleaded guilty to one count of second-degree assault on a peace officer, a class four felony. Boulder Police Officer Michael Marquez was the named victim. ECF 61-5 at 2–3.

10.     Officer Marquez had attended many of the hearings in Plaintiff's criminal case (16CR1703), including the change of plea and sentencing hearing on that day. ECF 66-4 at 11, 13. The case was important to Officer Marquez. *Id*. at 10.

11.     When Officer Marquez attended the 16CR1703 court hearing, he would make stern eye contact with Plaintiff to let him know he was there. *Id*. at 12–13.

12.     The 16CR1703 criminal case arose from an open container violation on "The Hill" in Boulder. On August 26, 2016, Officer Marquez and Officer Garretson approached four persons sitting in a circle sharing a bottle of whiskey and a beer. ECF 66-12. Officer Marquez believed that Plaintiff was being uncooperative (ECF 66-4 at 3) and used an "armbar takedown" to take him to the ground (ECF 66-12 at 6). As Officer Garretson further recalled in his Probable Cause Arrest

3

Affidavit Narrative, Officer Marquez then pinned Plaintiff to the ground. ECF 66-4 at 6. Plaintiff said, "You're choking me!" and Officer Marquez reduced the pressure against his chest. Plaintiff then grabbed Officer Marquez by his crotch and squeezed his left testicle. In response to the pain, Officer Marquez punched Plaintiff. The strike caused Plaintiff to stop, but in the process, Officer Marquez broke his hand. ECF 66-12 at 6.

13.     Officer Garretson and Officer Marquez continued attempting to restrain Plaintiff. Additional officers appeared on the scene. After Plaintiff was tased, the officers were able to handcuff him. *Id*. at 6; ECF 68 (Exhibit 15 at 0:10-0:27).

14.     After the arrest, Officer Garretson learned that Plaintiff had a seizure disorder. ECF 66-12 at 1.

15.     Officer Marquez expressed to Officer Garretson that he wanted Plaintiff to receive five years of incarceration. ECF 66-4 at 27. At the sentencing hearing, Officer Marquez told the court that Plaintiff should be incarcerated. *Id*. at 26. Officer Marquez explained that he had suffered intense pain during the incident and permanent injury to his hand. ECF 61-5 at 11, 14. Officer Marquez believed the probation sentence that Plaintiff ultimately received was "light for what happened." ECF 66-4 at 24.

16.     Plaintiff was sentenced to three years of supervised probation. The probation terms included a prohibition against possessing or consuming drugs or alcohol. ECF 61-5 at 28. Officer Marquez, who was at the hearing, heard the court impose that particular term. He understood it to mean that alcohol consumption would constitute a probation violation. He also heard the judge advise Plaintiff that this was his one chance, and that if he returned for re-sentencing, he would not be spared incarceration. ECF 66-4 at 16.

17.     Officer Marquez informed Officer Garretson and Sergeant Reichenbach of Plaintiff's probation sentence, including the condition against alcohol or drug use. ECF 66-4 at 23–24, 33; ECF 66-14 at 5. Officer Marquez also shared the information with other officers at the 5:00 p.m. roll-call that afternoon. ECF 66-4 at 20–22.

18.     Before he responded to the 9-1-1 dispatcher's call for the welfare check, Sergeant Reichenbach radioed that Plaintiff was "just sentenced today on assault on PO, start 3rd car, go in as a group." ECF 61-2 at 2, line 14.

19.     Officer Coon stated in his Probable Cause Arrest Affidavit Narrative that he "was aware that a condition of [Plaintiff's] probation was that he not consume alcohol or drugs," which he learned from a "personal conversation with Ofc. Marquez." ECF 61-9. Officer Coon testified at his deposition that while driving to Plaintiff's residence, Officer Marquez told him that "the Court had placed [Plaintiff] on probation and the court order included that he was not [to consume alcohol]." ECF 66-3 at 8–9. Officer Marquez confirmed that he had spoken privately with Officer Coon, but he could not recall the substance of the conversation. ECF 66-4 at 162–66. However, Officer Marquez did recall that he wanted to inform Officer Coon of the conditions of Plaintiff's probation to ensure proper documentation—if there was evidence of a probation violation. *Id*. at 35–36.

20.     The dispatcher also sent Boulder Police Officers Kicera, Lolotai, Quayle, and Barajas to Plaintiff's residence in response to Probation Officer Polk's welfare check request. ECF 66 at ¶ 12.

21.     Officer Marquez was on duty when the dispatcher requested the welfare check. *Id*. at ¶ 11. Officer Garretson and Officer Marquez voluntarily chose to respond as back-up, in response to Sergeant Reichenbach's request for a third car. ECF 66-4 at 32. However, Officer

Garretson made no mention of their voluntary response in his Case Supplemental Report. ECF 61-7.

22.     Officer Garretson and Officer Marquez had been patrol partners off and on since 2014. ECF 66-5 at 14, 22. Their assignment that evening was to the Neighborhood Impact Team in an entirely different area of town. ECF 66-13 at 16–18. (At a hearing in the second criminal case, 17CR1941, Officer Garretson testified that he was "in the downtown area" when dispatch requested the welfare check. ECF 66-8 at 7–8.) They drove to Plaintiff's residence in their patrol car. ECF 66-5 at 16; ECF 66-4 at 34. Officer Garretson was present in the car when Officer Marquez asked Officer Coon to document any evidence of a probation violation. ECF 66-4 at 36.

23.     At the residence, Mr. Bautts told Officer Coon that Plaintiff had left ten to fifteen minutes earlier. ECF 61-1 (Exhibit C at 3:12-3:24).

24.     Mr. Bautts explained that Plaintiff does not have a car and had left on foot. He described Plaintiff's clothes and backpack. Plaintiff's girlfriend confirmed that he "just took off" and confirmed the clothes and backpack description. She explained that Plaintiff was dealing with some court issues, had been sentenced to probation with fines and other conditions, and was "really overwhelmed." ECF 61-1 (Exhibit C at 3:33-6:05).

25.     The girlfriend recounted a telephone conversation earlier that day when Plaintiff called her from a hardware store and stated that he was looking at rope with which to hang himself. When Plaintiff came home, he stated that "he was done fighting," "was tired because the cop who arrested him got away with everything," and "got screwed over." ECF 61-1 (Exhibit C at 6:05-6:27). The girlfriend contacted Probation Officer Polk because Plaintiff continued to make suicidal statements after he had come home. ECF 66-9 at 4.

26.     Mr. Bautts explained to the officers that his biggest concern was how law enforcement might set Plaintiff off. He cautioned them that, "just so you guys know, you represent what he really hates right now . . . just know that when, if you do encounter him it could be . . . I wouldn't know what to expect." Officer Coon told Mr. Bautts and the girlfriend that the officers were there for Plaintiff and had an ambulance nearby. ECF 61-1 (Exhibit C at 6:27-7:00).

27.     The girlfriend told Officer Coon that Plaintiff had placed all of his prescription medications in one bottle and left with it. She stated that Plaintiff had prescriptions for muscle relaxers, ibuprofen, Lamictal (that he took for a seizure disorder), and Lexapro. ECF 61-1 (Exhibit C at 7:17-7:51); ECF 66-9 at 11. Officer Coon did not believe any of the medications to be controlled substances. ECF 66-9 at 11. Nor was Plaintiff reported to be in possession of any illegal drugs. *Id*. at 9.

28.     The girlfriend explained that even though he had received probation, Plaintiff felt that "the cop who pressed charges against him [referring to Officer Marquez] is gonna try and, um, get him, like, to violate so that he goes to jail." ECF 61-1 ( Exhibit C at 9:09-9:21). She told Officer Coon that Plaintiff felt that Officer Marquez had screwed him over. ECF 66-9 at 4.

29.     Plaintiff reported feeling "tired of fighting, he's just exhausted," and repeatedly said that his "soul is too tired to go on, that it was time for him to go meet his dad in heaven." She tried to calm him down. Plaintiff expressed appreciation for how she and her family had helped him, but he was done. He decided that "this is what I'm going to do." ECF 61-1 (Exhibit C at 9:22-10:07).

30.     The girlfriend further told Officer Coon that she had tried to keep ahold of Plaintiff to prevent him from leaving until the officers arrived. He still ran off, but in the process, she smashed her hand in the door frame. *Id*. at 10:25-10:33.

7

31.     The girlfriend told Officer Coon that Plaintiff had seen her text messages with Probation Officer Polk. He left when he saw that law enforcement was on its way. *Id*. at 11:10-11:30.

32.     Officer Coon told Mr. Bautts and the girlfriend that officers were out looking for him, but that "it's not our intent . . . you know, we don't want to jump on him and put him in jail." Mr. Bautts responded, "we know that, the only reason I raised it is because of his state . . . you guys may not be aware that he is going to react." *Id*. at 12:28-14:10.

33.     Officer Coon had spoken with Mr. Bautts and Plaintiff's girlfriend for about thirteen minutes. Neither said anything to indicate that Plaintiff had any weapons on him or had any access to weapons. ECF 61-1 (Exhibits C and D).

34.     While Officer Coon was speaking to Plaintiff's family, Officer Marquez approached Officers Lolotai and Quayle. He told them, "Just so you guys know, like, whoever's investigating this, like, it's critical about the drug aspect or any alcohol . . . like, if [the girlfriend] says that, yeh, he was drunk or took drugs," in reference to violating the terms and conditions of Plaintiff's probation sentence. ECF 68 (Exhibit 6 at 4:00-4:21).

35.     Officer Coon concluded the conversation and left the home. A few minutes later, Officer Coon and Officer Kicera re-entered to obtain additional information. A third officer also was present. The officers asked for Plaintiff's contact information including his cell phone number, middle name, and date of birth. ECF 61-1 (Exhibit D at 0:30-2:46).

36.     Officer Coon obtained additional information about the medications that Plaintiff reportedly had taken with him when he left. ECF 66-9 at 5.

37.     Officer Coon sought to clarify whether Plaintiff had ingested any of the medication or just placed them in the bottle. Officer Coon explained, "so we don't know if he has taken any

of them, or at least when he had left he hadn't taken any of them." The girlfriend answered that she did not believe that Plaintiff had ingested any of them yet. Then he asked if Plaintiff had been drinking. The girlfriend answered that he had consumed most of one beer while at home. ECF 61-1 (Exhibit D at 1:13-1:58).

38.     The dispatcher radioed that it was "unknown if [Plaintiff has] ingested the meds or just took them all with him// mental stat is not good and will prob not react well w/PD." ECF 61-2 at 3, line 59.

39.     Officer Marquez and Officer Garretson had left Plaintiff's residence and were searching for him on their own. Officer Marquez is heard to refer to Plaintiff as "the patient." Shortly thereafter, an officer is heard in the radio traffic to refer to Plaintiff as a "suspect." ECF 68 (Exhibit 6 at 8:10-18:45). Officer Marquez and Officer Garretson drove around town searching for Plaintiff, including at a liquor store. ECF 66-4 at 41-42.

40.     At 9:42 p.m., an employee at a teahouse restaurant called 9-1-1 about Plaintiff. The caller's description of the individual matched the girlfriend's description of Plaintiff. He was outside with the teahouse's manager, and the caller was concerned because he was upset, telling people he loved them, saying that he cannot do this anymore, and that "the cop won." The caller was Plaintiff's co-worker at the teahouse. ECF 61-2 at 3, line 66–79; ECF 68 (Exhibit 13).

41.     The 9-1-1 dispatcher asked the caller if he had noticed any weapons. The caller answered, "I did not, he was carrying a backpack or he is carrying a backpack, but I don't know what he has got in there." ECF 68 (Exhibit 13 at 1:26-1:35).

42.     At 9:42 p.m., the dispatcher radioed that Plaintiff was at the teahouse. ECF 61-2 at 3, line 66. Officer Marquez heard the broadcast, and he and Officer Garretson drove there. ECF 66-4 at 48–49; ECF 66-5 at 15.

43.     Detective Ashly Flynn and Sergeant Kristi Peterson also went to the teahouse. They were on duty at that time, in a plain clothes capacity on the Target Crime Team. ECF 61-3; ECF 66-7 at 3.

44.     At 9:51 p.m., Officer Coon broadcasted "affirm on M1." ECF 61-2 at 4, line 111. Officer Coon thereby advised the other officers "that we could have enough for an M1," (ECF 66-3 at 17), in reference to an involuntary 72-hour mental health hold.

45.     Detective Flynn observed someone matching Plaintiff's description standing outside of the teahouse speaking with another. She waited on Officer Garretson to arrive. ECF 61-3. She observed nothing threatening and aggressive in Plaintiff's appearance or behavior. Indeed, she observed nothing memorable about his behavior at all, for example, no walking difficulty. ECF 66-7 at 4-6.

46.     Officer Marquez dropped Officer Garretson off near the teahouse. Officer Marquez "stayed in close proximity, but far enough away to stay out of what was occurring there." ECF 66-4 at 49–50.

47.     Once Officer Garretson had arrived, he, Detective Flynn, and Sergeant Peterson entered the teahouse together. ECF 61-3. Sergeant Peterson was in charge inside the teahouse. ECF 66-3 at 13; ECF 66-13 at 9–10. She had supervisory authority over every other officer, and she was responsible for the other officers' conduct. ECF 66-13 at 13. She made the decision for all three to enter together, and she knew that Officer Garretson was involved in the prior incident with Plaintiff. ECF 66-13 at 36.

48.     Officer Garretson and Sergeant Peterson understood the purpose of their response was to conduct a welfare check and not to investigate a crime. ECF 66-8 at 25; ECF 66-13 at 20–21. Sergeant Peterson also knew that Plaintiff's probation sentence did not permit him to drink

alcohol. She believes that she learned that information from Detective Flynn, who in turn "might have been in contact" with Officer Marquez or Officer Garretson earlier that night. ECF 66-13 at 32–33.

49.     Officer Garretson was the first officer to go inside the teahouse and the first to contact Plaintiff. ECF 61-1 (Exhibit F at 0:00-0:30); ECF 66-5 at 17–18. Plaintiff reacted by turning around and walking away toward the teahouse's front door, attempting to navigate around the corner of a dinner table. ECF 61-1 (Exhibit F at 0:00-0:10); ECF 61-3. Officer Garretson, Detective Flynn, and Sergeant Peterson immediately surrounded him. ECF 61-1 (Exhibit F at 0:30-0:35). Officer Garretson grabbed Plaintiff from behind and handcuffed him; Detective Flynn grabbed him from the front. *Id.* at 0:10-0:28; ECF 61-3.

50.     Before Officer Garretson handcuffed Plaintiff, neither he nor anyone else had observed any weapons or other object in his hands. ECF 66-5 at 11–12; ECF 66-13 at 19. Nor, before handcuffing him, did Officer Garretson ask him any questions, including about suicidality. ECF 61-1 (Exhibit F at 0:00-1:00); ECF 66-8 at 16–17.

51.     Neither Sergeant Peterson nor Detective Flynn interfered with the handcuffing. ECF 66-7 at 21; ECF 66-13 at 30; ECF 68 (Exhibit 19 at 1:23-1:38).

52.     Within one minute, Officers Coon, Kicera, Quayle, and Lolotai were present inside the teahouse. ECF 61-1 (Exhibit F at 1:00). There were seven officers in total, including Sergeant Peterson, and she did not interfere with the group's presence. ECF 66-13 at 6; ECF 68 (Exhibit 19 at 1:23-1:38).

53.     Two citizens attempted to speak with the officers. Sergeant Peterson told one that "we will talk to you in a second." Officer Quayle spoke with the second. ECF 61-1 (Exhibit G at

1:20-1:43); ECF 68 (Exhibit 19 at 1:22-1:35). The second citizen later commented about how "aggressive" the officers had been with Plaintiff inside the teahouse. ECF 66-13 at 3–6.

54.     At 9:54 p.m., Sergeant Peterson radioed that Plaintiff was "Code 5" meaning a "prisoner in custody." ECF 61-2 at 4, line 129; ECF 66-13 at 18, 21.

55.     Boulder Police Department General Order 315 entitled Involuntary Hold provides at § 315-1 that "individuals who officers reasonably believe are an imminent danger to others or themselves, or are gravely disabled may be placed into custody by a police offer and held pending a mental health evaluation." ECF 61-6.

56.     Detective Flynn stood in front of Plaintiff and asked him about alcohol consumption, expressing "concern about [his] health." ECF 61-1 (Exhibit F at 0:28-0:50); ECF 61-1 (Exhibit G at 1:27-1:37). However, she did not have the opportunity to inquire about whether Plaintiff was an imminent danger to himself. ECF 66-7 at 17.

57.     Upon being handcuffed, Plaintiff momentarily lost his balance, and officers caught him from falling. ECF 61-1 (Exhibit G at 1:36-1:40); ECF 66-3 at 28.

58.     Detective Flynn wrote in her Case Supplemental Report her observation that Plaintiff "had very blood shot, watery eyes" and an odor of alcohol on his breath as he spoke. ECF 61-3.

59.     After smelling the alcohol, asking him if he had mixed it with anything, and seeing him almost fall, Detective Flynn asked Plaintiff if he wanted her to call an ambulance. In an emotional state, Plaintiff answered that "you guys" have hurt me so much already and "you've torn my soul apart." Plaintiff denied needing an ambulance, saying that "I'm fine." ECF 61-1 (Exhibit G at 1:27-1:58).

60.     While Detective Flynn was speaking to Plaintiff, Officer Lolotai conducted a pat-down search of him, pulling one prescription pill bottle from a pants pocket. Officer Lolotai gave the bottle to Officer Kicera. ECF 61-1 (Exhibit G at 1:42-2:22). Both Detective Flynn and Sergeant Peterson watched the search, but neither interfered in it. ECF 66-7 at 21; ECF 66-13 at 30; ECF 68 (Exhibit 19 at 1:48-2:20).

61.     Officer Coon then radioed for a medical team to meet them outside of the teahouse. ECF 61-1 (Exhibit G at 1:58-2:03).

62.     Detective Flynn again asked Plaintiff how much he had to drink. After he denied drinking, Detective Flynn responded that she could smell alcohol and was concerned that about him mixing it with drugs. Detective Flynn then asked him, "can you tell me if you took any of your medication in addition to your alcohol consumption?", to which he answered, "I didn't take anything." ECF 61-1 (Exhibit G at 2:03-2:20).

63.     After being handcuffed and during the pat-down search, Detective Flynn, Officer Coon, and Officer Garretson attempted to remove Plaintiff's backpack by loosening its two shoulder straps. Detective Flynn was able to remove only one strap, and Officer Coon cut the second strap. ECF 61-1 (Exhibit F at 1:40-2:08); ECF 61-1 (Exhibit G at 2:03-2:52); ECF 66-9 at 7; ECF 68 (Exhibit 19 at 1:54-2:53). Officer Garretson took the backpack. ECF 61-1 (Exhibit G at 2:52); ECF 68 (Exhibit 19 at 2:53-3:08).

64.     Neither Sergeant Peterson nor Detective Flynn intervened when Officer Coon cut Plaintiff's backpack off. ECF 66-7 at 22; ECF 66-13 at 8–9.

65.     Detective Flynn repeated that she was asking about alcohol to make sure he was okay; if he needed medical help, they would get it for him. Plaintiff nodded his head to indicate "yes" and then stated, "I'm not ok, you guys already beat me up enough, took everything from me,

you guys tased me, I don't know what else." Detective Flynn stated, "that was a long time ago, I'm talking about tonight ok, what's going on tonight?" Plaintiff then stated, "I just, I've had enough." ECF 61-1 (Exhibit G at 2:03-2:42).

66.     Officer Garretson asked the other officers, "you guys wanna get him out front?" meaning to the ambulance. ECF 61-1 (Exhibit F at 2:25-2:27).

67.     Through the time when Plaintiff was escorted outside, Sergeant Peterson did not believe that he had committed any crime. ECF 66-13 at 21.

68.     Detective Flynn and Officer Coon held onto Plaintiff as they walked him outside. He remained in handcuffs. ECF 61-1 (Exhibit G at 3:5-3:30). Plaintiff stated, "This is all Marquez's fault. This is all his fault." ECF 68 (Exhibit 19 at 3:50-3:54). He did not try to flee. He was cooperative, non-threatening, and non-aggressive. ECF 66-7 at 13. Sergeant Peterson did not interfere with the officers walking Plaintiff outside in handcuffs. ECF 66-13 at 31.

69.     Officer Garretson followed Plaintiff outside, carrying his backpack. ECF 61-1 (Exhibit F at 4:20-4:30); ECF 61-1 (Exhibit G at 3:27).

70.     While exiting the teahouse, Officer Garretson encountered a female who was crying and asked if Plaintiff was going to be okay. Officer Garretson said, "He's good." Officer Garretson asked her if she was his girlfriend. She answered no and explained that she just wanted to know if he was going to be okay. Officer Garretson replied, "Yeah, he's fine, he's just, we're worried about." The female asked where they were taking him. Officer Garretson said, "He's got to go to the hospital because he's taken all of his prescription pills and obviously drank alcohol with them." ECF 61-1 (Exhibit F at 2:45-3:06).

71.     The female explained to Officer Garretson that Plaintiff did not drink any alcohol while at the teahouse. Staff had given him tea because they were worried about him. Officer

Garretson responded, "He's not in the right frame of mind right now, so we just got to get him some help." Officer Garretson told her that Plaintiff would be at one of the hospitals and that the officers were getting him to the ambulance. ECF 61-1 (Exhibit F at 3:10-3:40).

72.     Detective Flynn and Officer Coon directed Plaintiff to sit on a concrete structure. Plaintiff stated, "Hey, I'm gonna cooperate with you guys. I respect cops." ECF 61-1 (Exhibit G at 3:53-4:00); ECF 68 (Exhibit 19 at 3:57-4:01). By this point, sixteen police officers were at the teahouse, constituting more than half of Boulder's on-duty law enforcement that night. ECF 66-13 at 16.

73.     Detective Flynn asked Officer Garretson, "Where's Marquez?" and instructed that he be kept away because Plaintiff "was talking about" him. ECF 61-1 (Exhibit F at 3:51-4:13).

74.     Officer Garretson searched Plaintiff's backpack, pulling out what appeared to be another prescription pill bottle. After opening it and smelling inside, Officer Garretson stated, "I think this is pot, but he might have taken stuff out of it, I don't know." ECF 61-1 (Exhibit F at 4:40-5:09).

75.     In reference to one of the prescription bottles found on Plaintiff, Officer Quayle commented, "This is just basically an anti-depressant" and "not very toxic." ECF 61-1 (Exhibit F at 5:07-5:13); ECF 68 (Exhibit 19 at 5:27–6:00).

76.     Officer Garretson found an unopened can of beer in a brown paper bag. At that point, he said, "Well there you go; there's his protection order," followed by, "Yeh, he's still possessing . . . possessing or consuming alcohol." ECF 61-1 (Exhibit F at 6:43–6:51).

77.     Lastly, he found a baggie of suspected psilocybin mushrooms inside a zipped-up fanny back to which he referred as Plaintiff's "little marijuana bag." ECF 61-1 (Exhibit F at 6:57–7:42).

78.     Plaintiff's backpack was searched after Officer Lolotai already had found the prescription pill bottle. ECF 66-13 at 28–29, 31. Officer Coon did not interfere with the second search. ECF 61-1 (Exhibit G at 5:24-7:30); ECF 68 (Exhibit 19 at 5:15-7:40). There was no warrant to search Plaintiff's backpack that night. ECF 66-8 at 32.

79.     The paramedics spoke with Plaintiff while he sat in handcuffs. Officer Coon kept his hand on Plaintiff's shoulder to prevent him from leaving, and Sergeant Reichenbach remained behind him. ECF 61-1 (Exhibit G at 4:22, 4:38); ECF 66-3 at 21; ECF 68 (Exhibit 19 at 3:59–7:40).

80.     Sergeant Reichenbach was one of the supervisors at the scene. ECF 66-14 at 11. Sergeants of the Boulder Police Department are considered to be city supervisors. They supervise and coordinate the work of police officers; enforce policies, procedures, rules, and regulations; and ensure the competent, professional, and timely performance of work duties. ECF 66-13 at 11–13; ECF 66-15.

81.     Plaintiff was coherent, logical, and lucid as well as compliant, cooperative, and non-aggressive during his conversation with the paramedics. He explained why he had become upset. He reported taking his medications that morning, including his epilepsy medication, but he denied ingesting any pills that night. ECF 66-3 at 22–26; ECF 66-7 at 16; ECF 68 (Exhibit 19 at 4:45-7:13).

82.     Officer Coon asked Plaintiff no questions about suicidality. Nor did he consult with the paramedics. ECF 66-3 at 25.

83.     When a paramedic asked the officers if Plaintiff had ingested anything, Officer Garretson responded, "Mushrooms . . . mushrooms probably." The paramedic commented, "That's probably why his pupils are blown." When Officer Alisha McNalley asked, "Did you say his pupils

are blown?," the paramedic replied, "Well, they're a little bigger than normal." Officer McNalley read aloud the dosage instructions on the prescription bottle found in Plaintiff's backpack, and the paramedic said that she was "trying to gauge where [she's] at" with him. ECF 61-1 (Exhibit F at 7:51–8:57).

84.     At some point, Officer Garretson tested the mushrooms, and it was presumptively positive for psilocybin. ECF 61-7.

85.     A paramedic directed Plaintiff into the ambulance for further evaluation. Plaintiff declined, responding, "I'm not crazy." The paramedic replied, "I just want to check medically that you're okay first." ECF 68 (Exhibit 19 at 7:15-7:36). Officer Coon then forced Plaintiff against his will to walk over and enter the ambulance. ECF 66-3 at 26.

86.     Before walking him over, Officer Coon searched him again. Plaintiff remained cooperative and polite. No weapons or drugs were found. ECF 61-1 (Exhibit G at 7:38-8:27); ECF 68 (Exhibit 19 at 7:40-8:26).

87.     Officer Coon and Officer Kicera kept ahold of Plaintiff as they escorted him, in handcuffs, to the ambulance. Plaintiff told them, "I don't want to get in here. She said I didn't have to get in here." Officer Coon told Plaintiff that he was forcing him to do so, at which point he entered the ambulance. ECF 61-1 (Exhibit G at 8:28-10:42); ECF 68 (Exhibit 19 at 9:32-9:45).

88.     A paramedic asked, "Is he in custody currently?" to which one of the officers gave a non-verbal affirmative answer. That prompted Plaintiff to ask, "for what?" and said, "See? You guys f***ing tricked me." The paramedic replied, "No, it's not us. We're the ambulance . . . That's the officer. We're not the officers." Plaintiff asked Officer Kicera, "What am I in custody for?" Officer Kicera did not answer and closed the ambulance doors. ECF 61-1 (Exhibit G at 10:19-10:44).

89.     While the paramedics examined Plaintiff, Officer Marquez approached Sergeant Reichenbach outside the ambulance and gestured with a thumbs-up and smile. ECF 68 (Exhibit 16 at 1:32-1:40); ECF 66-4 at 52. He spelled out Plaintiff's last name for Sergeant Reichenbach. Officer Garretson then approached them, carrying Plaintiff's backpack and grinning. ECF 68 (Exhibit 16 at 3:48-4:56). Sergeant Peterson walked with him to the ambulance. ECF 61-1 (Exhibit G at 13:49-14:10).

90.     Officer Kicera asked Officer Coon if he was taking Plaintiff to the jail and if he wanted him to follow. ECF 61-1 (Exhibit G at 13:44-13:51). Detective Flynn, knowing that Plaintiff was going to jail, asked Officer Coon for the assigned case number so that she could write a report. ECF 66-7 at 18. Officer Marquez understood that Plaintiff was under arrest and going to jail, and he left while Plaintiff was still inside the ambulance. ECF 66-4 at 53; ECF 68 (Exhibit 16 at 5:57-6:00). Detective Flynn does not know why Plaintiff was arrested. ECF 66-7 at 8.

91.     The paramedics medically cleared him and released him back into police custody. Officer Coon signed the paramedics' paperwork. ECF 61-8. He received no additional information from the paramedics about Plaintiff's condition. ECF 66-3 at 29-30.

92.     Plaintiff was placed in Officer Coon's patrol car. ECF 61-1 (Exhibit G at 19:18-20:00). The handcuffs from his initial encounter with Officer Garretson inside the teahouse were still on him. ECF 66-9 at 12–13.

93.     Around this same time, Sergeant Reichenbach called an on-duty deputy district attorney to speak about Plaintiff. ECF 61-10 at ¶ 10; ECF 66-14 at 15. One reason Sergeant Reichenbach had for calling was to alert the district attorney in the event the court's sentencing order had not been entered into the CCIC system yet. ECF 66-14 at 14.

94.     No written order existed on September 22, 2017 that prohibited Plaintiff from possessing or consuming drugs or alcohol. Awareness of that being a condition of Plaintiff's probation came from what Officer Marquez heard the judge orally pronounce at the sentencing hearing. Because judges' oral pronouncements generally are entered into the CCIC system as protection orders, Officer Garretson assumed one was in place for Plaintiff. ECF 66-5 at 19. Officer Marquez recalled no protective order being mentioned at the sentencing hearing. ECF 66-4 at 18-19.

95.     Officer Garretson made no mention of any sort of protection order in his arrest report. ECF 61-7. Neither did Officer Coon nor Detective Flynn in theirs. ECF 66-11; ECF 61-3. Officer Garretson made no mention of one in his court testimony on October 8, 2018 when he gave the reasons for Plaintiff's arrest. ECF 66-8.

96.     No officer at the scene filed a M1 Hold report to document probable cause for a mental health hold. ECF 66-5 at 9; ECF 66-7 at 20; ECF 66-11; ECF 66-13 at 23.

97.     At the jail, Officer Coon read Plaintiff his *Miranda* rights. Plaintiff did not waive his rights or agree to speak with law enforcement. Plaintiff declined a breath test. ECF 68 (Exhibit 12 at 0:45-2:42).

98.     Plaintiff was arrested for the unlawful possession of a controlled substance and felony probation violation. ECF 61-4.

99.     Plaintiff's arrest was carried out pursuant to the policies, practices, and customs of the Boulder Police Department, specifically, General Order 200. ECF 66-3 at 19; ECF 66-17 at 6.

100.     General Order 200 sets forth the Boulder Police Department's policy and procedures for when an officer may make an arrest. It contains no provision that authorizes a warrantless arrest for a probation violation. ECF 66-16.

101.    Officer Garretson believed that a probation violation constituted a crime. ECF 66-8 at 25.

102.    Detective Flynn does not believe that a probation violation constitutes a crime, but she does believe she still may arrest a probationer, without a warrant or detainer, on that basis. ECF 66-7 at 7–8.

103.    General Order 315 is a source for Boulder Police Department's policies and procedures for officers' community caretaking functions, including when to take someone into protective custody. ECF 66-5 at 8; ECF 66-13 at 22; ECF 66-18 at 1. General Order 315 does not authorize holding someone to the Boulder County Jail pending a mental health evaluation. ECF 61-6; ECF 66-7 at 10.

104.    Detective Flynn did not know whether Colorado's emergency commitment statute, Colo. Rev. Stat. § 27-65-105, allows law enforcement to transport someone in mental health protective custody to a jail pending a mental health hold. ECF 66-7 at 11.

105.    Sergeant Peterson denied ever receiving training related to Colorado's protective custody statute, M1 holds, or General Order 315. ECF 66-13 at 24.

106.    Officer Coon denied ever receiving training regarding General Order 315, responding to mental health illness, conducting welfare checks, community caretaking, or search and seizure. ECF 66-3 at 3–6. Officer Coon denies any violation of Plaintiff's constitutional rights or any other inappropriate action. ECF 66-3 at 20, 31.

107.    The officers' training logs reflect no training specific to the issues in this case: C.R.S. § 16-11-205, probation violations, General Order 315; emergency mental illness response, welfare checks, or community caretaking. ECF 67.

**<u>LEGAL STANDARDS</u>**

**I.      Fed. R. Civ. P. 56(c)**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*,

477 U.S. at 324).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## II.     Qualified Immunity

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly violative at the time of the official's actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "protects all but the plainly incompetent or those who knowingly violate the law." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The privilege is an entitlement not to stand trial or face the other burdens of litigation, and thus, it is immunity from being sued rather than a defense to liability. *Ahmed v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006). To overcome qualified immunity, a plaintiff must show (1) the defendant's actions violated a constitutional or statutory right and (2) the right was clearly established at the time of the defendant's conduct. *Harris v. Mahr*, — F.App'x —, 2020 WL 7090506, at *2 (10th Cir. Dec. 4, 2020).

When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff has the initial burden of showing that the defendant violated a constitutional right and the constitutional right was clearly established. In determining whether a plaintiff meets this burden, the court accepts the plaintiff's version of the facts as true, unless blatantly contradicted by the record so that no reasonable jury could believe it. If the plaintiff meets the two-part test, then the

defendant bears the traditional burden of the movant for summary judgment. *Halley*, 902 F.3d at 1144.

For a right to be "clearly established," its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016). A plaintiff "typically must identify 'an on-point Supreme Court or published Tenth Circuit decision,' but also may look to the 'weight of authority' from other courts." *Harris*, 2020 WL 7090506 at *2. The clearly established right must be "particularized to the facts of the case" and should not be defined "at a high level of generality," *id.*, especially in the excessive force context, *City of Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019). However, a case directly on point is not required so long as existing precedent has placed the statutory or constitutional question beyond debate. *A.N. v. Syling*, 928 F.3d 1191, 1197 (10th Cir. 2019). A general statement of the law can establish a right for qualified immunity purposes if it applies with obvious clarity to the specific conduct in question. *Ramirez v. Reddish*, No. 18-cv-00176-DME, 2020 WL 1955366, at *4 (D. Utah April 23, 2020). "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

### III.      Fourth Amendment Warrantless Arrest

To arrest someone without a warrant, the law enforcement officer must have probable cause of a crime. "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *A.M. v. Holmes*, 830 F.3d 1123, 1138 (10th Cir. 2016). A court examines the events leading up to the arrest and decides whether those historical facts, viewed objectively from the standpoint of a reasonable officer, amount to probable cause. Neither the arresting officer's subjective beliefs nor information gleaned after the arrest is relevant. Ultimately, the inquiry is whether the arresting officer possessed knowledge of evidence that would provide probable cause to make the arrest on some ground. *Id.* at 1138–39.

### IV.      Failure to Intervene

An officer may be liable for the failure to stop another officer from violating someone's Fourth Amendment rights. To establish a failure to intervene, a plaintiff must prove that a defendant officer (1) observed or had reason to know of a constitutional violation and (2) had a realistic opportunity to intervene. *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015). Moreover, the qualified immunity defense may be asserted in response to a failure to intervene claim. *See Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (finding the officer who observed the arrest and use of excessive force not entitled to qualified immunity against plaintiff's failure to intervene claim), *Fogarty v. Gallegos*, 523 F.3d 1147, 1163 (10th Cir. 2008) (considering whether the officer is entitled to qualified immunity against plaintiff's claim that he failed to intervene in the use of excessive force).

## ANALYSIS

### I.    Warrantless Arrest

Plaintiff's First Claim for Relief is that he was arrested without a warrant in violation of the Fourth Amendment. Defendants counter that they were justified in detaining and searching him.

### A.    Arrest

Defendants do not demonstrate how summary judgment may be entered in their favor on the question of *when* Plaintiff was placed under arrest. There is evidence that the initial handcuffing of Plaintiff—and keeping him in handcuffs—exceeded what was needed to carry out the welfare check. Plaintiff exhibited no outward signs of a medical or mental health emergency nor was he acting aggressively towards the officers or others. A pat-down search revealed no weapon, and his backpack was quickly removed from his person. Generally speaking, brandishing firearms and use of handcuffs on a suspect who is calm and compliant and who is not believed to be armed amounts to an arrest. *U.S. v. Soza*, 686 F. App'x 564, 568 (10th Cir. 2017). The evidence also could be construed to suggest that Defendants' engagement with Plaintiff was not limited to the welfare check context. There is evidence that they also were investigating whether he had violated his probation, an arrestable offense in their belief.

"In determining whether a formal arrest has occurred, courts ask whether a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest." *U.S. v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). Plaintiff argues that Officer Garretson arrested him when he handcuffed him at the encounter's beginning inside the teahouse (ECF 66 at 52–54), and the evidence could support such a finding. If he was arrested at that initial moment, then it renders moot Defendants' argument, based on *U.S. v. Neugin*, 958 F.3d 924 (10th

Cir. 2020), that evidence obtained from a search conducted in the course of a caretaking function may be used to show probable cause.

### B.      Community Caretaking Functions

Defendants primarily rely on the community caretaking doctrine to justify their search and seizure of Plaintiff. Law enforcement officers may exercise community caretaking functions that are "totally divorced from the detection, investigation, or acquisition of evidence related to the violation of a criminal statute." *Vazquez v. Andersen*, No. 18-cv-02645-STV, 2019 WL 2602523, at *6 (D. Colo. June 25, 2019). In the course of exercising those functions, an officer may seize a person regardless of any suspected criminal activity. However, a seizure in this context is for the purpose of ensuring the safety of the individual or public, and the degree of intrusion must be reasonable. *Id.* It is a clearly established right that a person may not be handcuffed during a community caretaking action if there is no ongoing emergency and the person is neither threatening police nor suspected to have a weapon. *Id.* at *9.

Plaintiff submits evidence that suggests that the Defendant officers' actions were not limited to a community caretaking function, whether as a welfare check under Colo. Rev. Stat. § 27-65-105 and General Order 315, or as a matter of emergency aid, *U.S. v. Najar*, 451 F.3d 710, 717–18 (10th Cir. 2006) (discussing the "exigent circumstances" exception to the Fourth Amendment's warrant requirement). That evidence precludes summary judgment in Defendants' favor on the question of whether the doctrine justified their warrantless detention and search of Plaintiff. It leaves open the possibility that they instead acted, either in whole or in part, to investigate a crime or other arrestable offense.

### C.      Criminal Contempt

In addition to the community caretaking doctrine, Defendants identify two criminal bases that justified their actions. Both concern the probation sentence that the state court judge orally pronounced earlier that day. They argue that probation violations may constitute indirect contempt of court which, in turn, may be treated as a crime. However, for the reasons the Court explains below in Section III(A), they did not comply with the prerequisites for making such an arrest.

### D.      Probation Violation

Plaintiff argues that the presumed violation of his probation was not a crime in the first place, and thus, it was not an offense for which the police officers had lawful authority to arrest him. In support, Plaintiff cites Colo. Rev. Stat. § 16-11-205(1) which specifies when "[a] probation officer may arrest any probationer." He argues that the statute's "clear, unambiguous" language only permits probation officers, not police officers, to conduct warrantless arrests of probationers. ECF 66 at 71. In that sense Plaintiff argues that Officer Garretson lacked probable cause to make the arrest.

Even if Plaintiff is correct that his arrest for a probation violation by Officer Garretson constituted a Fourth Amendment violation, he establishes only the first prong to overcome his qualified immunity defense. He also must establish that the right not to be arrested by a police officer for a probation violation was clearly established at the time, such that Officer Garretson should have known the arrest was improper. Plaintiff concedes that there is no United States Supreme Court or Tenth Circuit decisions addressing a police officer's warrantless arrest for a probation violation under that statute. ECF 66 at 77. Indeed, Plaintiff cites no case law at all on the issue. No case law is needed, he reasons, because the statute is unambiguous, and its plain language sufficed to clearly establish the right.

The two cases Plaintiff cites in support do not demonstrate how this Court may make the clearly established determination based on Colo. Rev. Stat. § 16-11-205 alone. At issue in *Kaufman v. Higgs*, 697 F.3d 1297 (10th Cir. 2012), was an arrest for obstructing a peace officer in violation of Colo. Rev. Stat. § 18-8-104(1)(a). Mr. Kaufman asserted "privilege" when he declined to answer one of the officer's questions during a consensual encounter. The court began its analysis with the statute's language, holding that it unambiguously did not criminalize Mr. Kaufman's silence. *Id*. at 1302. Second, the court found the Colorado Supreme Court's interpretation of the statute to confirm its understanding. *Id*. The court concluded that "[a]n unambiguous statute and a case from the state's highest court analyzing that statute and confirming its plain meaning are sufficient to 'clearly establish' the contours of the Plaintiff's Fourth Amendment rights." *Id*. In other words, the *Kaufman* court had the benefit of relevant, authoritative case law.

Similarly, *A.M. v. Holmes*, 830 F.3d 1123 (10th Cir. 2016), concerned whether the arrestee's conduct constituted an offense under a particular criminal statute. The arrestee was a thirteen-year-old student whose teacher called the school's resource officer for assistance because of disruptive behavior (burping and laughing). *Id*. at 1129–30. The officer arrested the student for violating the state's statute that proscribed willful interference with the educational process. *Id*. at 1130. The court found qualified immunity because the clearly established law as it existed at the time of arrest would not have apprised a reasonable officer that the student's conduct fell outside the statute's scope. *Id*. at 1138. As in *Kaufman*, the court considered the plain language of the statute. Because the statute was worded broadly enough to encompass the student's conduct, the court found that the plaintiff could not "carry her clearly-established-law burden by relying solely on the plain terms of [the statute.]" *Id*. at 1143. Second, the court considered the very limited case

law on the issue, and found nothing in it that would have made clear to the officer that he lacked probable cause to make the arrest. *Id*. at 1150.

Unlike in *Kaufman* and *A.M.*, the statute at issue in this case is not one that criminalizes specified conduct. Instead, it is a statute that sets forth when a probation officer may arrest a probationer. Plaintiff argues that the statute should have made clear that *only* a probation officer may arrest—or seek the arrest—of a probationer. However, the statute's plain language does not expressly deny a police officer such authority, and a court should resist reading a term or provision into a statute that does not appear on its face, *A.M.*, 830 F.3d at 1141–42. In that sense, the statute is ambiguous. Had a reasonable officer read the statute before arresting Plaintiff, that lack of police authority to make a unilateral arrest may not have been sufficiently apparent. Plaintiff cites no case law that interprets the statute in that way.

Case law can be a lens that reveals "a warning signal [that] is not readily apparent on the statute's face." *Id.* at 1143. Case law also provides guidance regarding the scope of proper conduct, *id.* at 1140–41, especially state court case law which is authoritative on state statutes, *Kaufman*, 697 F.3d at 1301. Because the statute itself does not expressly deny a police officer authority to arrest a probationer for a probation violation, there is need for Plaintiff to cite state court case law that created that warning signal or guidance in order to show that his right to be free from such an arrest is "clearly established." Plaintiff does not meet the "quite heavy" burden of showing a clearly established right, *A.M.*, 830 F.3d at 1147, on the basis of the Colo. Rev. Stat. § 18-8-104 statute alone.

The concept of arguable probable cause provides another framework for considering this point. It asks whether a reasonable officer in Defendants' position could have believed that there was probable cause—or rather, as applied here, the authority—to arrest Plaintiff for a probation

violation. An officer still may benefit from qualified immunity from a mistaken belief, so long as the mistake was objectively reasonable. *A.M.*, 830 F.3d at 1139–40. Plaintiff does not demonstrate how the Defendant officers' mistaken belief was unreasonable.

### 1.    Officer Garretson

Officer Garretson is the Defendant who first made physical contact with Plaintiff and who placed him in handcuffs. He remained with Plaintiff during the entire encounter at the teahouse until Officer Coon drove him to the jail. Although Officer Garretson did not mirandize Plaintiff, he did physically restrain him in a way that is the equivalent of an arrest. No other officer at the scene intervened in that seizure of Plaintiff's person. Therefore, the evidence could be construed to show that Officer Garretson was the officer who first placed him under arrest.

Because Plaintiff does not demonstrate how his arrest by a police officer for a probation violation violated a clearly established right, he does not overcome Officer Garretson's qualified immunity on that claim. Therefore, the Court enters summary judgment in his favor. It follows that Plaintiff also does not overcome the other officers' qualified immunity defense to his unlawful arrest or failure to intervene claims.

### 2.    Officer Coon

In his Complaint, Plaintiff broadly alleges that Officer Coon arrested him without a warrant or other lawful basis. However, he does not explain how Officer Coon can be held personally liable for the arrest; he does not distinguish Officer Coon's actions from the other individual Defendants (such as Officer Garretson). For present purposes, the Court assumes that Plaintiff was arrested for a probation violation. If the Court assumes that Officer Coon directly participated in that arrest, then it follows that he would enjoy the same qualified immunity that Officer Garretson does. Otherwise, if Officer Coon did not directly participate in Plaintiff's arrest, then the only basis for

holding him liable under Section 1983 would be under a failure to intervene theory. However, Plaintiff does not argue that Officer Coon should have intervened in his arrest. Therefore, the Court enters summary judgment for Officer Coon.

### 3. Detective Flynn and Sergeant Peterson

Nor does Plaintiff differentiate Detective Flynn and Sergeant Peterson's actions with respect to his arrest. If the Court assumes that they participated directly in his arrest for a probation violation, then they would enjoy the same qualified immunity that Officer Garretson does. If they did not participate directly, then they may not be found liable under Section 1983. *Fogarty*, 523 F.3d at 1162. In his Response, Plaintiff raises the new argument that Detective Flynn and Sergeant Peterson are liable for the failure to intervene and stop the arrest. They both had the rank to do so. However, Plaintiff does not demonstrate how they had reason to know the arrest was unconstitutional. If the right to be free from arrest by a police officer for a probation violation was not clearly established for Officer Garretson, it was not clearly established for them either.

Therefore, Detective Flynn and Sergeant Peterson are entitled to summary judgment on the unlawful arrest claim.

## II. Warrantless Search

Plaintiff's Second Claim for Relief is for an unconstitutional search. He brings it against Officer Garretson and Officer Coon.

### A. Officer Garretson

If, as Plaintiff argues, Officer Garretson formally arrested him upon handcuffing him inside the teahouse, then the subsequent searches of the backpack must be considered in that context. If Officer Garretson has qualified immunity against the warrantless arrest claim, then the question arises whether he has qualified immunity for the backpack searches done after the arrest. In the

absence of any argument to the contrary from Plaintiff, the Court finds that Officer Garretson's qualified immunity extends to the protect him from the unlawful search claim as well, and thus, it enters summary judgment in his favor.

**B.     Officer Coon**

Plaintiff alleges that "Officer Coon cut Mr. Franco's backpack off of his back with a knife, and Officer Garretson searched the backpack." ECF 1 at ¶ 119. Plaintiff alleges no other involvement by Officer Coon with respect to any search of Plaintiff's person or backpack. Officer Coon seeks summary judgment in his favor for Plaintiff's failure to show his personal, direct involvement. Personal involvement is necessary for Section 1983 liability. *Fogarty*, 523 F.3d at 1162. In his Response, Plaintiff raises no argument for how Officer Coon's act of cutting off his backpack made him directly involved in the backpack's search. Instead, Plaintiff frames Officer Coon's personal liability in terms of the failure to intervene. Defendant objects to Plaintiff asserting a new theory of relief in his Response, but even if it is taken into consideration, the argument still fails to show how Officer Coon could be found liable under 42 U.S.C. § 1983 for the backpack searches.

Plaintiff argues that Officer Coon should have known that the search exceeded the scope of permissible community caretaking functions. However, as the Court explains above, the argument that the officers exceeded the scope of their community caretaking function is the same as the argument that they were investigating a probation violation. If Plaintiff does not demonstrate how the right not to be arrested by a police officer for a probation violation was clearly established, then it follows that he does not show how Officer Coon should have known to intervene to stop the search done incidental to it.

Plaintiff raises a second challenge to the constitutionality of the backpack's search. Citing *Chimel v. California*, 395 U.S. 752 (1969), he argues that it exceeded what is permissible for a search that is incidental to an arrest because it was not limited to just his person and area of immediate control. However, Plaintiff does not bring a *Chimel*-based claim against Officer Garretson directly. Without a determination of whether Officer Garretson's searches were unlawful under *Chimel* (and whether Plaintiff overcomes any qualified immunity defense he might assert to it), Plaintiff does not to show how Officer Coon can be found indirectly liable under a failure to intervene theory.

Plaintiff does not show a basis by which Officer Coon can be held liable under Section 1983 for the searches of his backpack. Therefore, Officer Coon is entitled to summary judgment on this claim.

## III.    Failure to Train

Plaintiff seeks to hold the City of Boulder liable under Section 1983 for the unlawful arrest and searches. He alleges that those constitutional violations were facilitated by the police department's custom, pattern, and practice of not properly implementing relevant policies and procedures; and failing to appropriately train and supervise its officers with respect to them. ECF 1 at ¶¶ 114, 123.

### A.    Constitutional Violation

To establish municipal liability, Plaintiff first must demonstrate that the individual Defendant police officers committed a constitutional violation. *Ellis v. Ogden City*, 589 F.3d 1099, 1104 (10th Cir. 2009) (citing *Monell v. New York*, 436 U.S. 658, 690 (1978)). The Court's finding that the individual Defendant officers are entitled to qualified immunity does not shelter the City of Boulder from liability. *Hinton v. City of Elwood*, 997 F.2d 774, 782–83 (10th Cir. 1993).

Defendants' primary justification for the search and seizure of Plaintiff is as an exercise of their community caretaking functions (whether as a welfare check or emergency aid). The law permits the police to detain and search a person without a warrant on that basis. The law also permits a pat-down search and temporary detention for safety purposes. *Martinez v. Mares*, 613 F. App'x 731, 740 (10th Cir. 2015). However, the law limits the scope of a detention and search in the community caretaking context. Handcuffs are not justified if the person is non-threatening and cooperative. *Lundstrom v. Romero*, 616 F.3d 1108, 1123 (10th Cir. 2010). An officer may not search a civil detainee's personal effects. *People v. Chavez*, 855 P.2d 852, 855 (Colo. 1993). General Order 215 and Colo. Rev. Stat. § 27-65-105 expressly prohibits jailing someone in protective custody. Plaintiff submits evidence from which a jury could find that Defendants exceeded what was permitted—if the encounter is viewed through the welfare check lens.

One interpretation of the evidence is that Defendants saw no overt signs of mental health distress when they observed him outside of the teahouse, when they approached him inside the teahouse, or during their interactions with him thereafter. The pat-down search and the first search of his backpack revealed nothing to suggest a medical emergency. Nor did Plaintiff act in an aggressive way that would justify his continued restraint. If viewed strictly as a welfare check or the provision of emergency aid, the evidence could be construed as showing Defendants' actions went beyond what was reasonable under the circumstances.

However, there is evidence that Defendants' engagement with Plaintiff was not solely for a welfare check. Plaintiff submits evidence from which a jury could find that the Defendant officers were motivated, at least in part, to investigate a probation violation and to arrest him for that. Thus, there is evidence that Defendants crossed over from community caretaking functions to an investigatory function, and did so very early on, before they even personally encountered Plaintiff.

Assuming that he was in violation of probation, Plaintiff argues that it did not constitute a crime, and thus, there was no probable cause or other authority to permit his warrantless arrest on that basis. Defendants provide no argument to the contrary.

Instead, Defendants reframe the basis for the arrest as a violation of a court order. They argue that the "indirect contempt of court" is a crime for which law enforcement could have arrested him. Plaintiff emphasizes how they assert this basis for the first time in their summary judgment motion. Further, Plaintiff explains why criminal contempt does not justify his arrest. A warrant still was needed, and to obtain that warrant, Defendants had to satisfy the prerequisites of C.R.C.P. 107. ECF 66 at 72–73. Defendants cite no legal authority that otherwise would permit a police officer to arrest someone for indirect contempt without a warrant based on the officer's own probable cause determination. The Court adds that there is no evidence that any Defendant proceeded on that basis. There is no indication that Defendants suspected an act of criminal contempt, were investigating it, or arrested Plaintiff for that reason.

The evidence could support finding that Defendants' search and seizure of Plaintiff—whether done as a community caretaking function or on suspicion of a probation violation—violated his Fourth Amendment rights. Consequently, the Court denies Defendants' request for summary judgment on this element of municipal liability.

### B.     Causal Link

The next element of Section 1983 municipal liability asks whether a policy or custom was the moving force behind the constitutional violation. *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998). This requires Plaintiff to establish (1) the existence of a municipal policy or custom, (2) causation, and (3) deliberate indifference to the risk of harm. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

In his Response, Plaintiff frames his theory of municipal liability in terms of the failure to train. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[P]roving that a municipality itself actually caused a constitutional violation by failing to train the offending employee presents difficult problems of proof, and [courts] must adhere to a stringent standard of fault, lest municipal liability under § 1983 collapse into *respondeat superior*." *Id.* at 70.

Specifically, Plaintiff relies on a "single incident" theory. *See Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997) (noting that "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability"). Deliberate indifference may be inferred if the need for training is obvious and the inadequacy likely to result in the constitutional violation. *Id.* (citing *Canton v. Harris*, 489 U.S. 378, 390 (1989)). In other words, "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002).

### 1. Exceeding the Scope of a Welfare Check

The Boulder Police Department has a policy for community caretaking functions, General Order 315, which tracks the language of Colo. Rev. Stat. § 27-65-105. Plaintiff complains that there is no instruction about warrantless searches during a welfare check despite well-established case law on the subject. Plaintiff submits evidence that the individual Defendants received no training on that subject. ECF 67; ECF 82-1 at 18, 44. Citing *Olsen*, 312 F.3d at 1319–20 and *French v. City of Cortez*, 361 F. Supp. 3d 1011, 1043–44 (D. Colo. 2019), Plaintiff argues that

protective custody issues presumably are a frequent occurrence for law enforcement officers. At her deposition, Commander McEldowney agreed that welfare checks are frequently recurring situations that Boulder police officers encounter in the field. ECF 82-1 at 42.

Even if training is inadequate about the constitutional limits for searching someone in the course of a welfare check, Plaintiff does not demonstrate a link between that training deficiency and his claimed Fourth Amendment violations. He does not argue that Defendants searched his backpack solely as part of the welfare check. Rather, he attributes their more invasive actions to the investigation of the probation violation. There is insufficient evidence that Defendants' inadequate training would have led them to conduct the second, more invasive search of his backpack had they conducted he welfare check without awareness of any potential probation violation. Consequently, on this evidence, Plaintiff could not establish a causal link with respect to any training deficiencies on the subject of warrantless searches during a welfare check.

### 2.      Warrantless Arrest for a Probation Violation

Plaintiff submits evidence that the Boulder Police Department never trained the individual Defendants on Colo. Rev. Stat. § 16-11-205 or probation violation arrests. ECF 67; ECF 82-1 at 10–12, 15–16, 43–44. Nor does it have a policy specific to probation violation arrests. ECF 82-1 at 14, 17. General Order 200 sets forth the police department's general arrest policy, but it does not address probation violations. Sergeant Reichenbach testified that their practice is to arrest a probationer without a warrant if the officer could confirm the violation through some sort of documentation. ECF 77 at ¶ 226 (citing ECF 66-14 at 8). Officer Coon does not believe that any part of the officers' engagement with Plaintiff violated his constitutional rights. ECF 66-3 at 20. Moreover, Plaintiff submits evidence that Boulder's police officers encounter probationers on a recurring basis. ECF 82-1 at 42. Both the number of probationers residing in the surrounding

county and the number of court probation proceedings suggest the potential for recurring contact. ECF 66 at 86.

Plaintiff thereby submits sufficient evidence from which a jury could find it "highly predictable" that a Boulder police officer would make an arrest in violation of a probationer's Fourth Amendment rights. Therefore, the Court denies summary judgment in the City's favor with respect to this aspect of Plaintiff's *Monell* claim.

## CONCLUSION

The assumption that Officer Garretson placed Plaintiff under arrest inside the teahouse at the very start of law enforcement's encounter resolves many issues in his favor. However, even after viewing those issues in a Plaintiff-favorable way, he still does not overcome qualified immunity. Plaintiff fails to show how the individual Defendants acted contrary to clearly established law when they believed they had a lawful basis to arrest him. Therefore, the Court finds the individual Defendant officers entitled to summary judgment.

However, the City of Boulder does not demonstrate how summary judgment may be entered in its favor on Plaintiff's *Monell* claim. The City rests primarily on the argument that no Fourth Amendment violation occurred, but the evidence does not support summary judgment in its favor. Moreover, Plaintiff submits evidence from which a jury might find that inadequate training resulted in his arrest for a probation violation.

Accordingly, the Court **grants** Defendants' Motion for Summary Judgment [filed October 16, 2020; ECF 61] with respect to the individual Defendants. However, the Court **denies** the Motion with respect to the City of Boulder.

Entered this 8th day of March, 2021, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge