IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02634-MEH

SAGE B. FRANCO,

     Plaintiff,

v.

CITY OF BOULDER, COLORADO,

     Defendant.

---

**ORDER ON DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A
MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50, ALTER OR AMEND
JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e), IN THE ALTERNATIVE
FOR A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59(a), OR FOR REMITTITUR**

---

**Michael E. Hegarty, United States Magistrate Judge.**

     Defendant has filed its post-trial motion seeking various forms of relief from the jury

verdict and judgment. ECF 143.  I held oral argument on these motions on February 14, 2022.  I

make the following rulings.

## BACKGROUND

     On September 22, 2017, Boulder police officers detained Seth Franco[1] in the Dushanbe

Tea House in Boulder, Colorado. Earlier that day, in Boulder County District Court, Seth Franco

had pleaded guilty to assault on a police officer. Boulder police officer Michael Marquez, who was

the victim of the assault, attended and addressed the court at that sentencing, asking the sentencing

judge to impose the maximum penalty provided by the law. The judge sentenced Seth Franco to

probation; previously the judge had always given a sentence of incarceration for this crime. The

---

[1] I will refer to Seth Franco by his full name. Seth Franco passed away prior to the trial in this case.
I will refer to Sage Franco, his brother and representative, as "Mr. Franco" or the Plaintiff.

sentence included a condition that Seth Franco not consume alcohol. The sentencing judge warned Seth Franco that he would put Seth Franco in jail or prison if he violated his probation. Officer Marquez listened to that courtroom colloquy. Then, Officer Marquez and Seth Franco saw each other immediately after the sentencing, as Seth Franco was walking away from the courthouse and Officer Marquez was in his police vehicle.

Later that same day, Seth Franco was despondent, believing that the Boulder police were never going to leave him alone (September 22, 2017, was not his first encounter with Boulder police). Several people, including Seth Franco's probation officer, some acquaintances, and some co-workers at the Dushanbe Teahouse (where he was employed) in downtown Boulder contacted Boulder police requesting a welfare check for possible suicidal ideation. Boulder police searched for Seth Franco and, at the same time, investigated the circumstances of his despondency (*e.g.*, speaking to the acquaintances at least twice in a short time frame, including inquiring about his use or possession of alcohol). Boulder police found Seth Franco at the Dushanbe Tea House and immediately detained him, surrounding him with officers and handcuffing him. In the first seconds of the encounter, they cut off his backpack (without resistance from Seth Franco), patted him down, and began asking him questions, with the interrogating officer being only inches from his face. The questioning officer focused on Seth Franco's use of alcohol that day, asking him at least eight or nine times whether he had been drinking. Boulder police eventually led him out of the Dushanbe Teahouse in handcuffs and seated him on a bench. Incidentally, of the twenty-two total Boulder police officers on duty the evening of September 22, 2017, sixteen responded to the Dushanbe Teahouse for the welfare check. This included Officer Marquez, who was in the immediate vicinity of the scene but did not participate in the encounter.

Seven minutes into the encounter, Boulder police searched Seth Franco's backpack and found, among other things, and unopened can of beer and illegal psylocibin mushrooms,

possession of which was a crime as well as a violation of his probation. Officer Marquez came into the picture around that time. As Seth Franco was put into an ambulance, Officer Marquez is seen on camera giving a "thumbs up." The entire encounter, from when Boulder police first found Seth Franco in the Dushanbe Teahouse until he was put into the ambulance, was recorded on numerous body cameras with both video and audio. Seth Franco would eventually spend twelve days in jail until he bonded out.

This civil rights action under 42 U.S.C. § 1983 proceeded to a five-day jury trial the week of October 18, 2021. Seth Franco's brother Sage was the Plaintiff, as representative of the estate, as Seth Franco had, in the interim between the underlying event and trial, taken his own life. Plaintiff's theory was that although Boulder police justified the stop and detention under the law enforcement community caretaking function, their real purpose was arresting Seth Franco for a probation violation, believing that would send him to prison. The facts demonstrated that this arrest, if based on a probation violation, was unconstitutional, as Boulder police do not have the legal authority to arrest for technical probation violations. Because that civil rights violation was not clearly established at the time it occurred, I had granted the several individual police officers' motion for summary judgment under qualified immunity. I permitted a municipal liability claim to proceed to trial, based on the finding that the City of Boulder had never offered its police officers any training whatsoever on arresting someone for a probation violation; that many of the people Boulder police encounter are on probation (meaning this is common and recurring situation Boulder police confront); and that the utter lack of training caused the constitutional violation. The jury returned a verdict in Plaintiff's favor, finding the City of Boulder liable for $3.41 million in damages caused by failing to train its police officers, who, as a result, violated Seth Franco's Fourth Amendment rights.

## **LEGAL AUTHORITY**

Defendant raises several legal theories in seeking post-trial relief. I will address each.

## I.      **Judgment as a Matter of Law, Fed. R. Civ. P. 50(b)**

Fed. R. Civ. P. 50(b) governs a trial court's post-verdict review. Judgment as a matter of law under Rule 50 "is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *In re: Cox Enters., Inc.*, 871 F.3d 1093, 1096 (10th Cir. 2017). "Judgment as a matter of law is cautiously and sparingly granted and then only when the court is certain the evidence conclusively favors one party such that reasonable [people] could not arrive at a contrary verdict." *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 766 (10th Cir. 2019). A Rule 50(b) movant can only reassert the same grounds for judgment as a matter of law that he first asserted in his pre-deliberation Rule 50(a) motion. *See Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017) ("Arguments presented in a Rule 50(b) motion cannot be considered if not initially asserted in a Rule 50(a) motion.").

## II.     **Alter or Amend Judgment, Fed. R. Civ. P. 59(e)**

Rule 59(e) motions may be granted when "the court has misapprehended the facts, a party's position, or the controlling law." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). After a judgment has entered, however, "the public gains a strong interest in protecting the finality of judgments." *Nelson v. City of Albuquerque*, 921 F.3d 925, 929 (10th Cir. 2019). Further, in *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008), the Court held that "Rule 59(e) permits a court to alter or amend a judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810.1, pp. 127–28 (2d ed.

1995)). Rule 59(e) does not apply to sufficiency of the evidence challenges. *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1220 (10th Cir. 2013).

### III.    Motion for a New Trial, Fed. R. Civ. 59(a)

"A motion for a new trial is generally not regarded with favor, and is granted only with great caution." *United States v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972). "'Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial.'" *Nosewicz v. Janosko*, 857 F. App'x 465, 468 (10th Cir. 2021) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2803 (3d ed. Apr. 2021 update)). A new trial under Rule 59(a) is available when the district court's decision "rests on an erroneous legal conclusion or lacks a rational basis in the record." *Harmon v. City of Norman, Okla.*, 981 F.3d 1141, 1146 (10th Cir. 2020). "In deciding a new trial motion based on insufficiency of the evidence, a district court must analyze whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." *Elm Ridge*, 721 F.3d at 1216 (quotations omitted). The trial court must "view[ ] all the evidence in the light most favorable to the prevailing party." *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006). When a defendant contends that the jury's verdict was against the weight of the evidence, the "verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009).

The size of the jury's verdict may also be grounds for review. A new trial (or a remittitur) may be granted when a jury award is "so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *Therrien v. Target Corp.,* 617 F.3d 1242, 1257 (10th Cir. 2010) (citation omitted). Finally, "[i]t is well settled that mere excessiveness in the amount of an award may be cured by a remittitur,

whereas excessiveness which results from jury passion and prejudice may not be so cured. In that case, a new trial is required." *Mason v. Texaco, Inc*., 948 F.2d 1546, 1561 (10th Cir. 1991).

<u>**ANALYSIS**</u>

### I.     Was There a Factual and Legal Basis for *Monell* Liability

I accept Defendant's argument that the City of Boulder has an extensive training program. There was no evidence at trial suggesting otherwise. I also accept as established fact that at no time did Defendant provide training to its officers concerning the legal authority for, or procedure to utilize when, encountering a probation violation. This was the testimony of every witness from Boulder police who was asked that question. The Boulder police training commander, Katherine McEldowney, acknowledged the City did not train on what to do with people on probation. The training records for the individual officers showed no such training. The individual officers testified they believed they could arrest a person in Boulder for a probation violation, without a warrant. They also testified they were never trained about probation violations.

Not only did Boulder not train on how to encounter those on probation, it also did not train on the concept of a detainer. The chief probation officer of the City and County of Boulder, Greg Brown, testified at trial, without objection, to the following: (1) the chief judge of Boulder County (20th Judicial District) issued a directive in 2004 governing the issuance of detainers in that entire judicial district for persons suspected of probation violations; (2) that directive is provided to law enforcement; (3) the directive provides that a probation office determines whether a detainer should be issued for a suspected probation violation, which is then issued by that office; (4) when a probation office issues a detainer, it is provided to law enforcement to effectuate the arrest; (5) when someone is arrested pursuant to a detainer for a probation violation, the probation officer initiates a process for getting the arrestee before a judicial officer, which includes providing the jail a copy, whereupon the jail will put the arrestee on the next district court probation docket (a

6

docket that occurs daily); (6) the probation office did not issue a detainer for Seth Franco; (7) because of the lack of a detainer, the routine process for getting an arrested probationer before a judicial officer was not initiated for Seth Franco for several days, since the probation office was unaware he had been arrested for a probation violation. Commander McEldowney testified she did not know what a detainer was. She also testified there was no training in Boulder on detainers. Officer Peterson testified she did not know what a detainer is.

The trial included testimony on the frequency with which Boulder police may encounter someone on probation. Boulder's chief probation officer testified further, again without objection, that the number of probationers averaged about 1,800 adults and 200 juveniles yearly. With a population of approximately 100,000, this is a relatively significant number of people, creating a probability that contacts with someone on probation are likely in the daily business of the Boulder police. Further, he testified the vast majority of people on probation struggle with technical violations. Training Commander McEldowney testified that persons on probation are a recurring situation that Boulder police officers encounter in the field. She also testified that the question of what to do with someone on probation, who has reportedly violated a term of probation, is a recurring situation that Boulder police officers encounter in the field. This testimony was uncontroverted and unrebutted. Boulder introduced no evidence on this subject matter.

The interplay between the legal authority to briefly detain pursuant to the law enforcement community caretaking function (related to possible suicidal ideation of Seth Franco), and the legal authority to arrest for a probation violation, is at the heart of this matter. The probable cause arrest affidavit of Seth Franco executed by Boulder Police Officer Stephen Coon lists two charges: (1) Unlawful Possession of a Controlled Substance and (2) Probation Violation – Felony. Ex. 15. In the narrative, Officer Coon stated that based on a personal conversation with Officer Marquez, Officer Coon was aware that pursuant to his sentence for probation, Seth Franco was not permitted

to consume alcohol. An incident/investigation report (Ex. 16) also stated Seth Franco was arrested for a probation violation. A September 27, 2017, letter from Boulder police (signed by Officer Coon) (Ex. 17) to the Colorado Bureau of Investigation laboratory stated that Seth Franco was first arrested for a probation violation, and during the search incident to that arrest, officers found the illegal mushrooms.

At trial, I determined that there was sufficient factual basis and legal authority for the Boulder police to briefly detain Seth Franco under the community caretaking function based on objective information the police had received about his suicidal state of mind. I instructed the jury of the same. It was for the jury to determine whether the constitutional scope of that detention was exceeded and, if so, whether the continued detention and ultimate arrest were for a probation violation. I determined then, and reaffirm here, that an arrest for a technical probation violation (as opposed to a crime) violated Seth Franco's constitutional rights. The central issue, then, is whether the City of Boulder can be held liable for the constitutional violation under a municipal liability theory (*Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978)).

The *Monell* Court noted that municipal liability does not attach simply because one of its officers violated the Constitution. 436 U.S. at 694. Only when an officer executing a government policy or custom inflicts the constitutional injury may the municipality generally be held liable. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). In the absence of an explicit policy or an entrenched custom, "the inadequacy of police training may serve as a basis of § 1983 liability . . . where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *Id.* Therefore, I start with *Canton*, which set the standard for judging failure to train cases.

In *Canton*, a person was detained for about an hour at a police station. She was incoherent and slumping to the floor. The police left her lying on the floor, never summoned medical care,

and released her, an ambulance (provided by her family) subsequently taking her to a hospital. Under municipal regulation, police shift commanders were authorized, in their sole discretion, to decide whether medical care was needed, but the city did not provide any training beyond basic first aid in educating commanders as to when to summon medical care for a detainee. The Court dealt squarely with the question when "inadequate training [can] be found to be a 'policy' that is actionable under § 1983." *Id.* at 383.

The Court stated that the initial inquiry under a *Monell* theory is whether "there is a direct causal link between a municipal policy or custom and the alleged constitutional violation," which the Court expressly agreed was a difficult question in any case. *Id.* at 385. It analyzed this question as follows. First, the petitioner asked to Court to adopt a rule "that a municipality can be found liable under § 1983 only where 'the policy in question [is] itself unconstitutional.'" *Id.* at 386. The Court engaged in that analysis without adopting as a rule, finding that a municipal policy requiring the city jailer to take a person needing medical care to a hospital for medical treatment is constitutional. Here, a policy the completely omits the subject of probation violations, and does not train officers whatsoever on how to deal with probationers, might be unconstitutional in and of itself. If so, that would be the end of the question. However, I do not make such a finding and thus will proceed with analyzing this case under a failure to train theory.

Next, the Court found that, without more, a city is not liable under Section 1983 if one of its employees happened to apply a constitutional policy in an unconstitutional manner. That situation is inapposite here, because no employee applied any policy at all in arresting Seth Franco for a technical probation violation.

Finally, the Court addressed the situation in which "a concededly valid policy is unconstitutionally applied by a municipal employee, [and] the city . . . has not . . . adequately trained [the employee] and the constitutional wrong has been caused by that failure to train." *Id.*

at 387. In that instance, the Court "conclude[d], as have all the Courts of Appeals that have addressed this issue, that there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Id.* As to when such a failure to train rises to a level of a constitutional violation, the Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. As examples of what conduct arises to deliberate indifference, the Court offered these: (1) "'a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers," *id.* at 389 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality opinion)); and (2) "where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy,'" *id*. In the seminal statement on the issue, the Court held:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390. This is precisely what the Plaintiff argues under the facts here. The duties of a "patrol" police officer puts that city employee in constant contact with persons who are engaged in some wrongdoing. On a regular and recurring basis, those persons will be offenders on probation. Therefore, the need for training for officers on what to do when confronting an offender on probation, in the absence of a detainer emanating from the probation office, is so obvious, that the decision not to create a policy nor train police on when they can and cannot arrest for a probation violation will likely result in an unconstitutional arrest, so that Boulder can be said to have been deliberately indifferent to the need.

The *Canton* Court gave a concrete example that is relevant here. It posited that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons." *Id.* at 390 n.10. "The city," the Court continued, "has armed its officers with firearms, in part to allow them to accomplish the task." *Id.* The Court concluded that under those circumstances, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* (citation omitted). I believe the same can be said of the moral certainty police officers will confront probation violators. Boulder has given its police officers a badge, a gun, and authority to take the life or liberty of the persons police encounter, so the need for a policy and to train under that policy here is sufficiently obvious, and the utter failure to train potentially deliberately indifferent, that it created a question of fact for the jury.

Boulder argues the next section of the Court's analysis goes in its favor. The Court stated that it will not suffice, alone, that a police officer is "unsatisfactorily trained," such as when "an otherwise sound program has been negligently administered." *Id.* at 391. "Neither will it suffice to prove that an injury . . . could have been avoided if an officer had better or *more* training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.* (emphasis added). It is difficult to reconcile this latter statement in light of the actual holding, which found potential liability when the plaintiff proves there was an *obvious need* for "*more* . . . training." I believe that the *obvious need* for training is the distinguishing factor missing in Boulder's reliance on this part of the Court's analysis. That is, if more training would have avoided the injury altogether, but the preexisting need for that training was *not* obvious as described by the Court, then liability should not attach. But if the opposite is true, it creates a jury question.

Finally, the Court held that, in any event, the "deficiency in the city's training program must be closely related to the ultimate injury," *i.e.*, "the deficiency in training actually caused the

police officers' indifference." *Id.* Causation in this regard was defined by the question whether "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Id.* A trial court is tasked with "[p]redicting how a hypothetically well-trained officer would have acted" if properly trained. *Id.*

I believe Instruction No. 37 was consistent with *Canton*. In that Instruction, the jury was told that the Plaintiff must prove:

> Defendant City of Boulder's inadequate training program affirmatively and directly caused the violation of Seth Franco's Fourth Amendment rights. In other words, the failure to train adequately must be closely related to the violation such that the Fourth Amendment violation would have been avoided if the Defendant City of Boulder's training program was not deficient in the way Plaintiff contends. However, a finding that the arrest could have been avoided by better or more training does not, by itself, establish the necessary link.

Based on the obvious need established by the Plaintiff, the jury was tasked with determining whether the utter lack of training was the cause of the injury such that Seth Franco's arrest would have been avoided if the officers had been trained on their lack of authority to arrest for probation violations. They answered yes, and I can find no reversible infirmity in that verdict.

Cases that I found analogous to this situation include, for example, *Thomas v. Cumberland Cty.*, 749 F.3d 217 (3d Cir. 2014), in which the court found it would be proper for a jury to decide whether a complete lack of training in conflict de-escalation caused a correctional officer to fail to intervene when several inmates argued and then engaged in a fight. Plaintiff's theory was that as the other inmates started to argue with Thomas and demonstrate potential aggression, a correctional officer who was witnessing the events should have stepped in and diffused the situation. In such a setting (open population prison), the need for this type of training was obvious, none was provided, and the correctional officer did not stop a fight from occurring, resulting in injury to the prisoner plaintiff. The court found these facts stated a claim for municipal liability, relying mainly on the predictability (obviousness) of the potential harm. In fact, Plaintiff has a

stronger causation argument than Thomas, because Thomas did not claim that the correctional officer engaged in any affirmative conduct that caused his injury, but rather, failed to act. The *Thomas* court hinged its finding on its conclusion that the county jail "'fail[ed] to provide protective measures and fail safes' to prevent mistakes in a situation that occurs frequently." *Id.* at 226 (citation omitted).

Additionally, in *J.K.J. v Polk Cty,* 960 F.3d 367 (7th Cir. 2020), two female inmates were sexually assaulted in a county jail by a correctional officer. The county had a written policy that prohibited sexual contact between inmates and guards, but it failed to address the prevention and detection of such conduct and did not provide any meaningful training on the topic. Even considering this and other allegations of sexual abuse, the county did not review its policy or provide additional training. In *J.K.J.,* the plaintiffs did not claim the county took affirmative action to harm them (or even that an individual employee took such affirmative action). Rather, they claimed the county's policy, although prohibiting sexual contact and requiring responses to alleged violations, had "material gaps," creating an atmosphere in which a constitutional violation was likely to occur. *Id.* at 378. The court agreed, finding municipal liability permissible under those facts.

The present case demonstrates a stronger causal link than *J.K.J.* Boulder's inaction (failing to have a policy or to train its officers concerning authority to arrest those on probation) actually caused affirmative conduct by its employees against Seth Franco. All the officers believed they had the legal authority to arrest for a probation violation, even absent a warrant or detainer. Had Boulder police been trained that they do not have the legal authority to arrest someone for a probation violation (at least in absence of a detainer), the initial arrest here would not have occurred. The police would have seen that Seth Franco was not an immediate threat to himself or

others, and that would have been the end of the encounter. This is, at least, what a jury could reasonably have found on the case that was tried.

Even more pertinent to this discussion is *Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002). In that case a person with obsessive compulsive disorder (OCD) was brought into the county jail. He had several panic attacks while being processed, but the correctional deputies did not know how to address these psychiatric events. The county had general procedures regarding intake for persons with "mental illness" or "psychiatric disorders," but no deputy had received training on OCD. In addressing the county's liability, the court started with the proposition that deliberate indifference can be established when the municipality has actual or constructive knowledge that a failure to act is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard that risk. *Id.* at 1318 (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999)). The court reiterated that in a "single incident" case, the underlying constitutional violation must be a "highly predictable" or "plainly obvious" consequence of the municipality's failure to train. *Id.* A plaintiff must also prove the injury would have been avoided if the officers were trained under a program that was not deficient in the identified respect. *Id.* (citing *Canton*, 489 U.S. at 391). Applying these principles, the court held that plaintiff had shown sufficient facts for a jury to find the county "manifested deliberate indifference by failing to train its jail's prebooking officers to recognize OCD and hand sufferers appropriately." *Id.* Concerning the high predictability or plain obviousness element, the court noted that OCD occurs in two percent of the general population (*not* the population of persons being booked into jail), which the court viewed sufficiently frequent (without *any* showing that the jail had previously confronted OCD, or anything in the record indicating the frequency with which persons with OCD enter the jail) to meet this element. "Given the frequency of the disorder, Davis County's scant procedures on dealing with mental illness and the prebooking officers' apparent

ignorance to his requests for medication, a violation of federal rights is quite possibly a "'plainly obvious' consequence" of Davis County's failure to train its prebooking officers to address the symptoms." *Id.* (citation omitted). In any event, the court found it was for a jury to decide.

While I realize *Olsen* may be at the periphery of cases in which potential *Monell* liability can be found, Mr. Franco presents a much more compelling case. In *Olsen*, as noted in the dissent, the jail actually had procedures for responding to medical needs of prisoners, 312 F.3d at 1328 (Hartz, J., dissenting), while Boulder had no procedures or training for probation violations. Further, in *Olsen,* there was no evidence of the potential frequency with which the jail would confront OCD. Here, there was both empirical testimony of the numbers of probationers in a *relevant* population (in the City of Boulder) and admissions by Boulder police that they, in fact, deal with probation violators on a regular basis.

I find these cases consistent with *Connick v. Thompson*, 563 U.S. 51, 67 (2011), in which the Court expounded on *Canton.* There, the Court stated that "[t]he *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force. . . .  [Plaintiff's] complaint therefore cannot rely on the utter lack of an ability to cope with constitutional situations that underlies the *Canton* hypothetical." That is what the Plaintiff alleges here, an utter lack of ability by officers to determine how to act in a constitutional situation, because Boulder never gave them that ability. Thus, Plaintiff argues he meets the "single-incident *Canton* theory." *See, e.g., Boston v. Suffolk Cty., New York,* 326 F. Supp. 3d 1, 17 (E.D.N.Y. 2018) (describing single-incident theory). Indeed, in *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 409 (1997), the Court referenced *Canton* as "not foreclose[ing] the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." (citing *Canton*, 489 U.S. at 390 & n.10).

Boulder cites *Carr v. Castle*, 337 F.3d 1221, 1230 (10th Cir. 2003) for the proposition that an allegation of an absence of specific training for officers that could have helped them in an encounter with the public does not meet the *Canton* standard. However, in *Carr*, the Tenth Circuit found that the record failed to demonstrate to the city an obvious need for training "in the *City of Canton* sense." *Id.* at 1229. In *Carr*, the plaintiff suggested that a well-trained officer should have known the plaintiff was an emotionally disturbed person and thus approached him with more caution. This is a high level, "you could have done better" allegation rather than an attack on a specific manner in which the city utterly failed to train its officers in a situation that is likely to recur and would involve potential constitutional violations. Further, even the *Carr* court noted that, in contrast with an allegation that officers *were* trained but in the wrong manner, "'[t]he causal link between the officers' training and the alleged constitutional deprivation is more direct than in cases in which *officers are not given enough training to know the correct response to a dangerous situation*.'" *Carr*, 337 F.3d at 1231 (quoting *Allen v. Muskogee, Okl.*, 119 F.3d 837, 844 (10th Cir. 1997)) (emphasis added). I do not believe *Carr* supports Boulder's position.

Boulder also relies on a proposition stated in several Tenth Circuit cases as follows:

> We have also further clarified that proof of a single incident of unconstitutional activity is ordinarily not sufficient to impose municipal liability, and where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued.

*Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009) (citing *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)). As I read cases using that principle, they draw a distinction between specific "failure to train" cases and the general category of "single incident" cases. For example, in *Jenkins*, in one paragraph, the court stated (1) "if the inaction theory rests on an alleged failure to train, the plaintiff must prove 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can

reasonably be said to have been deliberately indifferent to the need' for additional training," 81 F.3d at 994 (citation omitted), and (2) "[i]n the case where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *Id.* (citation omitted). Although the court drew this distinction, in my review of the cases, a "failure to train" can frequently be the underlying theory in a "single incident" situation. I believe it is self-evident that if the theory is failure to train, there will not be a person with authority actually directing an officer to take a particular illegal course of action. The *deliberate* indifference will be proved through the obviousness of the need for training. *Jenkins* was not a failure to train case. The same is true for *Moss* and all other Tenth Circuit cases to reference this proposition. *See Suro v. Tiona,* 784 F. App'x 566 (10th Cir. 2019) (no failure to train theory but citing the same proposition about person with authority); *McDonald v. Wise*, 769 F.3d 1202 (10th Cir. 2014) (same); *Van Curen v. McClain Cty. Bd. of Cty. Comm'rs,* 4 F. App'x 554 (10th Cir. 2001) (same); *J.B. v. Washington Cty*., 127 F.3d 919 (10th Cir. 1997) (same*); Hollingsworth v. Hill*, 110 F.3d 733 (10th Cir. 1997) (same). These cases all appear to deal with an unconstitutional policy, or some other fact situation that takes them outside the failure to train analysis. On the other hand, the cases are legion dealing with a *Canton* single incident case under a failure to train theory.

Viewed in a light most favorable to Mr. Franco, I find the evidence and the law permitted the jury to find Boulder liable for a failure to train that caused the underlying violation here.

## II.    Whether the Verdict Was a Result of Passion or Prejudice

Boulder argues that the verdict was against the weight of the evidence and/or a result of passion or prejudice. I do not agree it was against the weight of the evidence for the reasons given above. Concerning the size of the verdict, I must determine whether the verdict's infirmity is

excessiveness, in which case the cure of a remitter is available, or whether the passion and prejudice influenced the jury, in which case a new trial is necessary. *Mason v. Texaco, Inc*., 948 F.2d 1546, 1561 (10th Cir. 1991).

> We have said that absent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate. . . . Such bias, prejudice or passion can be inferred from excessiveness. . . . However, a verdict will not be set aside on this basis unless it is so plainly excessive as to suggest that it was the product of such passion or prejudice on the part of the jury.

*Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 703 F.2d 1152, 1168 (10th Cir. 1981). However, "a remittitur may be appropriate if the error affects the amount of damages awarded without affecting the finding of liability." *Osterhout v. Bd. of Cty. Comm'rs of LeFlore Cty., Okla*., 10 F.4th 978, 996 (10th Cir. 2021). *See Malandris*, 703 F.2d at 1168 ("[A]nother remedy is also recognized. Where the court concludes there was error only in an excessive damage award, but not one also tainting the finding of liability," a remittitur is appropriate) (citations omitted).

I cannot find that the large verdict in this case is so plainly excessive that it resulted from passion and prejudice, as opposed to being merely excessive. In Colorado, both state and federal courts, million-dollar verdicts have become common in civil rights actions against law enforcement under Section 1983 and the state law equivalent. The size of the verdict, standing alone, is not shocking to this judicial conscience, but as explained below, in light of the circumstances of the encounter and its aftermath, it is clearly excessive.

To support its claim of passion or prejudice, Boulder cites to the playing of a video of Seth Franco's arrest in 2016 which resulted in his conviction for assaulting a police officer. It was Exhibit 32. Defendant objected to the video under Fed. R. Evid. 402, 403, and 404(b). I sustained the objection in part but admitted the video for the limited purpose of Seth Franco's state of mind on September 22, 2017, including his allegation of damages. I instructed the jury that the "plaintiff

is not seeking nor may you award damages for anything that occurred in 2016, at least with regard to this incident." Trans. at 150, ECF 136.  The video was played to the jury. It showed a nighttime encounter with Seth Franco and had significant visual (*e.g.*, flashing police lights) and audio (*e.g.*, sirens, Seth Franco screaming) effects. Later in the trial, the video was played again, by Plaintiff's counsel, during the testimony of Officer Garretson, without identifying to the Court or opposing counsel what was about to be played. The video started, and Boulder's counsel objected on cumulative grounds. I did not know that it was Exhibit 32 that was about to be played. After it was played, the only question asked of Officer Garretson was, "You were present when that happened; right?" Once the video began, I did not stop the playing of the video, but I immediately excused the jury when it was finished, following the one question to Officer Garretson. Because I sensed that Plaintiff's counsel was using this opportunity merely to get an inflammatory video before the jury, I stated the following:

> You cannot play that video for purposes of inflaming the jury without it having an evidentiary value at the moment, and I believe that's what you're doing. So, unless you want me to react in a very negative way in front of this jury, I warned you ahead of time that there better be a new, fresh question with regard to your playing of the video, and all you said was, you were there when that happened? All you had to do was ask, were you there when [Seth] Franco was confronted the year before by police? We had already seen the video. I will not let you go deep into 403 for purposes of inflaming the jury. So, tell me what your reasonable good-faith basis was for playing that video.

Trans. at 697, ECF 138. Even given the video's obvious imagery, I do not believe it can form the basis for a finding that the jury acted on passion or prejudice. First, I gave the jury a cautionary instruction the first time it was played. Second, I advised the jury after the second playing:

> So, members of the jury, attorneys, we have described them as zealous advocates of their clients, and that's true for both sides. Okay? Now, before that video was played, I advised Mr. Griffin that if you're going to play it, we would need to have something of evidentiary value associated with it. I found that they did not, and so you can just disregard the playing of that video and then the question afterwards.

Trans. at 706, ECF 138. Third, immediately upon returning to the courtroom, the jury gave a note to the Court stating: "We don't want to see that tape we have seen it 2x! (2016)." ECF 125.

If anything, the playing of that video prejudiced Plaintiff, because the jury was clearly offended having to see it again. Moreover, videos or pictures of interactions with police (or the aftermath thereof) are common and necessary in civil rights cases. It was relevant for the purpose for which it was admitted, it was not unduly prejudicial, and its second showing does not materially change those conclusions.

## III.    Remittitur

While I do not believe a new trial is justified, I do believe the damage award here was excessive, and remittitur is appropriate. Here, while the finding of liability was supported by the evidence, I agree with Boulder the verdict was legally excessive. The size of the verdict, especially in light of the nature of Seth Franco's damages (he was not physically injured -- indeed, it was an unremarkable encounter with police in terms of any use of force); the contents of Plaintiff's counsel closing argument; and instructions I gave to the jury, lead me to this conclusion.

In closing, Plaintiff's counsel requested $2.1 million. He justified that request based on (1) the value of a "citizen in a free country" losing that freedom, even temporarily, Trans. at 1160, ECF 140; (2) the mental anguish of seeing the same police officer making the arrest who, the prior year (2016), had been present at Seth Franco's arrest; and (3) the impacts of these events on someone like Seth Franco who had suffered prior, unrelated brain injuries (obviously an eggshell plaintiff argument), *id.* I find nothing nefarious in these arguments.

The encounter with Seth Franco was not violent in any sense. Although upon seeing the police in the Dushanbe Teahouse, Seth Franco started to walk the other direction, the police stopped him without struggle; neither he nor the police were at any time aggressive in their actions; Seth Franco's backpack was cut off (because he was handcuffed, it could not be slid off his

shoulder) but not in an abusive manner; the conversation between Seth Franco and the police was calm; and at all times Seth Franco was standing or was gently seated on the outside bench. The principal damages were the loss of liberty, the time spent in jail prior to bonding out, and the emotional impact of being arrested again.

Specifically in order to avoid a verdict fueled by passion or prejudice, I instructed the jury (at the Court's *sua sponte* initiative) that "[c]ompensatory damages are not allowed as a punishment and must not be imposed or increased to penalize the Defendant City of Boulder," Instr. No. 39, ECF 134, because municipalities are immune from punitive damages under 42 U.S.C. § 1983, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). I also instructed them: "You must not be influenced by sympathy, bias, or prejudice for or against any party in this case." Instr. No. 10. I further instructed them: "You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion." Instr. No. 16. Finally, I instructed the jury that it "may not award damages for any conduct by the Defendant City of Boulder or its police officers for any event that occurred in 2016." Instr. No. 40. I will assume the jury followed that instruction. However, I do not believe Defendant's counsel even addressed the issue of damages in his closing.

As to the appropriate remittitur amount, I find Plaintiff's counsel's closing demand of $2.1 million to be the correct place to rest. This method was approved in *Osterhout*, 10 F.4th at 996. Further, it would not be profitable to search for an appropriate award by comparing this case with damages awards in other cases. As the *Osterhout* court noted, "'comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations' and 'detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence.'" *Id.* at 999 (citations omitted).

Of course, Plaintiff is entitled to choose either a new trial on damages or accept this remittitur. "No judgment for a remittitur may be entered without the plaintiff's consent because the Seventh Amendment prohibits the court from substituting its judgment for that of the jury's regarding any issue of fact." *Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1225 (10th Cir. 2004). Plaintiff shall file a notice of his decision within seven days of the date of this Order.

## CONCLUSION

As described herein, I find the evidence and the law permitted the jury to find Boulder liable on the *Monell* claim, and the verdict on liability was the result of neither passion nor prejudice. However, I find the damages amount to be excessive to the extent that a remittitur is appropriate. Accordingly, Boulder's "Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50, Alter or Amend Judgment Pursuant to Fed. R. Civ. P 59(e), in the Alternative for a New Trial Pursuant to Fed. R. Civ. P. 59(a), or for Remittitur" [filed November 24, 2021; ECF 143] is **granted in part** and **denied in part**.

Entered this 16th day of February, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge